Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

# UNITED STATES DISTRICT COURT
### for the

District of OREGON

FILED 15 AUG '25 12:44 USDC-ORP

Personal Representative PORTland Division
of the Estate of
Louis J Remillard (Power of Attorney)

Stella Marie Freaux

**Plaintiff(s)**

*(Write the full name of each plaintiff who is filing this complaint.
If the names of all the plaintiffs cannot fit in the space above,
please write "see attached" in the space and attach an additional
page with the full list of names.)*

-v-

Andrew B Grasley, MD.
Federal Bureau of Prisons and U.S.A.
Integrated Medical Solutions LLC (Texas
AKA: Integrated Medical Solutions INC

**Defendant(s)**

*(Write the full name of each defendant who is being sued. If the
names of all the defendants cannot fit in the space above, please
write "see attached" in the space and attach an additional page
with the full list of names.)*

Case No. 3:25-CV-1452-SB

*(to be filled in by the Clerk's Office)*

Jury Trial: *(check one)*  ☐ Yes  ☐ No

1) Constitutional Rights Violations:
Violation of the Eighth Ammendment
Delay and Denial of Essential medical
Care (Buens claims)

2) Wrongful Death and Abuse
of A Vulnerable Person under Oregon

3) Law and the Federal Tort Claims Act
(28 U.S.C.S. § 1346 (b)(1)

## COMPLAINT FOR A CIVIL CASE

### I. The Parties to This Complaint

#### A. The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if
needed.

Name            Stella Marie Freaux
Street Address  1301 1st Ave SW
City and County GReat Falls (MT)  Cascade County
State and Zip Code  MT 59404
Telephone Number  406 - 461 - 5634
E-mail Address  Text to the Above number

#### B. The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an
individual, a government agency, an organization, or a corporation. For an individual defendant,
include the person's job or title *(if known)*. Attach additional pages if needed.

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

Defendant No. 1

Name Andrew B. Grasley (MD)

Job or Title *(if known)* Chief Medical Officer Sheridan FCI

Street Address 27072 Ballston Road (work Address)

City and County Sheridan - Yamhill County

State and Zip Code OR 97378

Telephone Number 503-843-4442

E-mail Address *(if known)* unknown

Defendant No. 2

Name Federal Bureau of Prisons + U.S.A.

Job or Title *(if known)* FCI Sheridan Prison

Street Address 27072 Ballston Road (work)

City and County Sheridan - Yamhill County

State and Zip Code OR 97378

Telephone Number 503-843-4442

E-mail Address *(if known)* unknown

Defendant No. 3

Name Integrated Medical Solutions LLC (Texas) AKA: Integrated medical Solutions INC.

Job or Title *(if known)* LLC company (texas) and INC

Street Address 1485 Heritage Pkwy

City and County Mansfield - Tarrant County

State and Zip Code TX 76063

Telephone Number 817-477-0400

E-mail Address *(if known)* Unknown

Defendant No. 4

Name N/A

Job or Title *(if known)*

Street Address

City and County

State and Zip Code

Telephone Number

E-mail Address *(if known)*

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

## II.     Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case. In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction? *(check all that apply)*

☒ Federal question          □ Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

### A.     If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

1) Bivens Claims- Constitutional Rights Violations: Eighth Ammendment Delay and Denial of Essential Medical CARe = 403 US 388 (1971, 28 USC § 1331, 28 USC § 1346 and 29 USC § 794

2) Wrongful Death and Abuse of a Vulnerable Person under Oregon law and 3) the Federal Tort Claims Act (28 U.S.C. § 1346(b)(1)

### B.     If the Basis for Jurisdiction Is Diversity of Citizenship

1.     The Plaintiff(s)

    a.     If the plaintiff is an individual

The plaintiff, *(name)* _____N/A_____, is a citizen of the State of *(name)* _____N/A_____.

    b.     If the plaintiff is a corporation

The plaintiff, *(name)* _____N/A_____, is incorporated under the laws of the State of *(name)* _____N/A_____, and has its principal place of business in the State of *(name)* _____N/A_____.

*(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2.     The Defendant(s)

    a.     If the defendant is an individual

The defendant, *(name)* _____N/A_____, is a citizen of the State of *(name)* _____N/A_____. Or is a citizen of *(foreign nation)* _____N/A_____.

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

b.  If the defendant is a corporation

The defendant, *(name)* _____N/A_____ , is incorporated under

the laws of the State of *(name)* _____N/A_____ , and has its

principal place of business in the State of *(name)* _____N/A_____ .

Or is incorporated under the laws of *(foreign nation)* _____N/A_____ ,

and has its principal place of business in *(name)* _____N/A_____ .

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

3.  The Amount in Controversy

The amount in controversy—the amount the plaintiff claims the defendant owes or the amount at stake—is more than $75,000, not counting interest and costs of court, because *(explain)*:

_____N/A_____

**III.  Statement of Claim**   Louis J Remillard died on 17 Aug 2023

✱
See Attached
Statement
By Witness

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

Family member Louis J. Remillard was denied essential medical treatment by the defendants named. He was diagnosed with severe cancer documented in his medical records and was denied transfer to a medical facility until it was to late to help him or for him to fight it (Immune system compromised) He made numerous attempts over a 6 month period to medical to Request treatment + transfer that were witnessed by numerous individuals

(See Attached Detailed Statement of Claim)

**IV.  Relief**

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

1) Economic Damages - 1 million Dollars each Charge

2) Non-economical Damages $10 million Dollars Each Charge

3) Punitive Damages $10 million Dollars Each Charge

( Punitive Damages will be sought if not addressed in this Complaint

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

## V.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.    For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:    8 Aug 25

Signature of Plaintiff    Stella Marie Creaux

Printed Name of Plaintiff    Stella Marie Excoux

### B.    For Attorneys

Date of signing:    N/A

Signature of Attorney    N/A

Printed Name of Attorney

Bar Number

Name of Law Firm

Street Address

State and Zip Code

Telephone Number

E-mail Address

III   Statement of Claim  (continued and detailed)                                    8 Aug 25

1.    Louis J Remillard was never offered or prescribed any form of cancer treatment by Dr. Andrew B. Grasley or anyone else at the Sheridan FCI medical clinic once he was diagnosed with a serious form of cancer in his stomach area.  Louis made numerous visits between Oct of 22 until the end of March 23 while he was there requesting treatment for his condition.  His requests were denied and unanswered by the staff.

2.    FCI Sheridan is a care level 2 facility and unable to meet his needs once the cancer was detected and should have been immediately transferred to a Bureau of Prisons medical hospital. His condition placed him in a care level 4 medical status based on Bureau of Prisons standard and he should have been immediately transferred to one by Dr. Grasley and the Sheridan FCI administration to a place where he could receive the treatment that he deserved to get by Bureau standards.

3.    Louis made numerous requests to Dr. Grasley to transfer him to a facility that could take care of him and Dr. Grasley ignored his requests.  His medical status alone warranted the transfer that Dr. Grasley also ignored.

4.    Attatched is a witness statement by Stanley Carl Green who was also up at medical several times also seeking treatment while Louis was there seeking his.

5.    Sheridan FCI medical has a long history of documented medical neglect and negligence over the past few years during the timeframe when the incidents with Louis occurred.  The Dept of Justice Inspector General performed an audit on the facility from Nov 27 to Dec 2023 in which the facility failed terribly in the medical section as well as the rest of the facility.  That IG report is attatched for you to view.  It can also be found at the DOJ-IG website under "FCI Sheridan DOJ report May 2024.  The audit took place 3 and a half months after Louis died.  There are numerous violations listed in the report on Sheridan FCI medical and how they conducted their medical treatment.

6.    Inmate Christopher Fleet, Reg# 50575-065, died on approximately 30 Sep 23 with conditions that mirrored Louis's while he was in the care of the medical at Sheridan FCI.  He also died from cancer.

7.    Attatched is a statement by Dale Lee Walker who provided a statement in regards to his care. He settled a Tort Claim with the Federal Bureau of Prisons, Western Region, in Stockton CA in regards to DR. Grasley's treatment of him over the course of the past several years.

8.    Attatched is an article conducted by NPR with the Butner medical facility where Louis was transferred to on appx Mar 31, 2023 to try and get him the help it he deserved. In it you will see that Butner staff stated that inmates are getting transferred way to late in their conditions to help them.  Louis was one of those people.

9.    If you will google "7 deaths at Sheridan FCI" you will see numerous articles and statements in regards to the deaths there over the past several years and the deep concern about how the medical section there was being run.  Louis was one of the 7 deaths in those articles.  Those articles also contained comments by Senator's Merkely and Wyden who are the 2 sitting US Senators for this state.  They are aware of the conditions at the Sheridan facility and stated so in their comments.

10. There is currently a wrongful death and Bivens claim complaint filed in the Portland Division U.S. District Court against Dr. Grasley, Sheridan FCI, and Integrated Medical Solutions LLC. The case number is 3:23-cv-903 for the same kind of lack of care that individual did not get while at Sheridan FCI as Louis did not get.

11. No other comments

Stella Marie Ereaux

1301 1st Ave SW

Great Falls  MT  59404

406-461-5634

To:  U.S. District Court                                                          8 Aug 25

    Portland Division

    Attn: Civil Court Proceedings

    1000 SW 3rd Ave

    Portland OR 97204


Dear Sir/Ma'am


    My name is Stanley Carl Green, Dob-6-11-1962, and my current address is 6000 NW 80th Ave, Portland OR 97218.  I am giving the following statement in regards to Louis J Remillard and my interaction with him while we were at Sheridan FCI in Sheridan OR from January to March 2023.


    I met Mr. Remillard while we were both in the medical section at Sheridan FCI while we were seeking treatment from Dr. Andrew Grasley the beginning of January 2023 for serious medical conditions.  Dr. Grasley was both of ours primary care doctor during that time.  Mr. Remillard and I started talking and he explained to me that he had been coming up to medical for a couple of months for his cancer that was diagnosed.  He told me that he was not getting the treatment he was asking for and was visibly frustrated and scared.  I told him that if he needed help filling out the emergency BP-10 to send to region to try and get help I would help him with it.  This is all verifiable by the security cameras that are in medical.

    At the end of the month I saw him again there and he said that Dr. Grasley was not doing anything for him and that he had asked him for a transfer out to a medical facility who would care for him. He said he had been up there between those 2 visits and that he had been turned away again.  At that time I explained how he had to fill out the BP-10 to region and what to say.  He said he was going to fill one out and send it in to get treatment and a transfer out to get help.  He had lost a lot of weight and was not looking very good at the time.

    The middle to the end of February I saw him up there while trying to get my own treatment and he said he had filled it out and sent it in to region and that he still had not been seen for help. Approximately a couple of weeks after that inmate Todd Weidler who worked with Mr. Remillard in CMS came to me telling me that he was not getting any treatment or help and that he looked bad. He asked me if I could turn it into Courtney Withycombe, Lead Investigator, at the Federal Public Defender's office in Portland to try and help him, which I did.  It was known by everyone in the facility that I would do this for anyone who was not getting help from medical to try and pressure Sheridan into getting treatments for inmates.  Several inmates already had gotten treatment this way from the letters that I had sent to her.  This is verifiable by the file that Ms. Withycombe maintains at her office in Portland OR on Mr. Remillards condition.  I also gave Mr. Remillard's mother who I had called her phone number and she had been in contact with Courtney.  Mrs. Remillard could not understand why they were not treating him nor why they had not shipped him to a hospital.

I saw Mr. Remillard a couple of times in the chow hall the month of March and he had lost more weight. I did not talk to him during those interactions but Mr. Weidler had informed me that they were still not helping him during March. After the month of March I never saw him again. I was told by Mr. Weidler later that he had finally been shipped to Butner and later on he told me that he had been granted a compassionate release almost as soon as he had gotten there by the Butner FMC medical staff. I was told that it was too late to help him because of the delay in medical treatment so they released him.

Stanley Carl Green

6000 NE 80th Ave

Portland OR 97218

Phone # 503-758-3861

I, Dcl. Walker am writting this Statement. 8-6-25

in May of 2024, I had a diabetic ulcer. in April of 2024 Dr. Bresley found the diabetic ulcer do to a blister on the side of my left foot. I was not given the medical supplys I need to keep it clean. in May of 2024 I caught cellulitis and was hospitalized. before that was denied medical attention, Dr. Bresley would not see me. my foot was swollen and red and hot to the touch. they refused me a wheelchair and the nurses told me I was fine. well come May 2024 I could no longer walk on my left foot. i had to tell the staff at F.C.I Sheridan that I had a medical emergency. was helped to medical by another inmate. So From my building to medical is a long ways. 200-300 ft. they didn't come help or nothing. So when I got to medical, Dr. Bresley took one look at my foot and told the nurses to send me to the emergency room. I spent 3 days in the hospital on heavy antibiotics through a I.V. when I got out of the hospital, I ended up gettin 3 more infection. in August of 2024, my left pinky toe was amputated. Aug 25, 2024 do to lack of medical and denial by medical staff. i ended up catching marsa, and a backteria infection in my Bone. i spent a week in the hospital that time. the lutinet at the time told me to keep the wheelchair. then medical denied changing my Bendados after my sargery. I went 3 days without a Bandage change. when the doctor from the hospital told staff and medical staff that it had to be changed daily. after that i put in a B.P. 8, B.P. 9, B.P. 10, B.P. 11. I Filed a tort claim on F.C.I Sheridan medical staff and Doctor Bresley. I was contacted by a attorney From the tort claim, they settled my tort claim For $17,250. do to the Doctor and medical staff. I was in pain For months at a time. But I could "not" get the help I needed to save my pinky toe. I was put on crutches going up and down hills and clear to medical to get my medication. I asked a begged For a wheelchair and was told By "Joyce" "they had none" and my "Doctor" went approve one. i went to medical "Sick call" monday, tuesday, wednesday, thursday, Friday asking For Help. i was told to leave and go back to that i wasn't need time when ask medical attention. i called home to

my mother Kesha phillins" to call a ambulance to the prison so I coei'ng it the help I needed. my own mother called the prison and asked what was going on. they told her there is nothing they can do. its up to medical.

Please if you need any more information on this matter, please contact me. all my information is listed below.

Dale Lee Walker

*Dale Lee Walker*

phone# 208-260-0435

address:
1241 20th Street.
Heyburn, ID
      83336

my mother Kesha phillins" to call a ambulance to the prison so I coei'ng it the help I needed. my own mother called the prison and asked what was going on. they told her there is nothing they can do. its up to medical.

B.P. 8

STATE OF MONTANA } SS
County of Cascade
**Form 6.3**
I hereby certify that the letters to which this certificate is affixed is a true, correct and compared copy of the original on file in this office of the Clerk of the District Court, and that the date of appointment was November 14th 2023 and that the same are in full force and effect. WITNESS my hand and the seal of the District Court of Cascade County this 14 day of November 2023

TINA HENRY
Clerk of Court
Cascade County Montana

District Judge Name
Court Name
Address
City, State, Zip
Phone#

MONTANA _____ JUDICIAL DISTRICT COURT,

Cascade COUNTY

IN RE THE ESTATE OF
Louis J. Remillard

Deceased.

Probate No. DDP-23-U2/2

**LETTERS**
**(FOR INTESTATE ESTATE)**

Application by Stella M. Ereaux for appointment as Personal Representative in intestacy of the estate of the above-named decedent, having been made and granted by Order in the above proceeding dated the 14th of NOV. 2023

Letters of appointment as such Personal Representative are hereby issued as provided by law.

WITNESS the Clerk of Court and the seal of the Court affixed this 14th day of November • 2023

(COURT SEAL)

Clerk of Court    Elizabeth Sweeney

By:---------------------
Deputy Clerk

COURT SEAL

LETTERS (for intestate estate) - PAGE - 1

Form 6.2

District Judge Name
Court Name
Address
City, State, Zip
Phone #

MONTANA __8th__ JUDICIAL DISTRICT COURT,
__Cascade__ COUNTY

IN RE THE ESTATE OF
__Louis J Remillard__
Deceased.

Probate No. __DDP -23-0272__

ORDER OF INFORMAL APPOINTMENT
OF PERSONAL REPRESENTATIVE IN
INTESTACY

The application of __Stella M. Ereaux__ for the informal probate of the intestate Estate of the above-named decedent and the appointment of a Personal Representative, having been filed with the Clerk, and it appearing that the application is complete and contains the Applicant's oath or affirmation that the statements contained therein are true to the best of his knowledge and belief, the Clerk makes the following findings based upon said application:

1. __Louis J Remillard__ died on __August 17 20 23__, and at least 120 hours have elapsed since decedent's death.

2. The Applicant is an interested person as defined by §72-1-103 (25), MCA (2005).

3. The Application is complete and properly verified as required by law.

4. Venue is proper for the reason stated in the Application.

5. No Will has been offered for probate in this state or elsewhere, and the Applicant is not aware of any Will of the decedent.

6. Any notice required by §72-3-106, MCA (2005), has been given.

ORDER OF INFORMAL APPOINTMENT OF
PERSONAL REPRESENTATIVE IN INTESTACY -
PAGE - 1

§ 72-3-222, MCA (2005)

Form 6.2

7. Applicant is entitled to be appointed Personal Representative in intestacy of the estate of the decedent because his/her priority is as stated in the application, and he/she is otherwise qualified.

NOW, THEREFORE, IT IS ORDERED as follows:

1. The application for informal appointment of Personal Representative is hereby granted, and ___Stella M. Zreaux___ is hereby appointed as Personal Representative of the Will and estate of the above-named decedent ☑ without bond ☐ upon giving bond in the amount of $_____.

2. Letters shall be issued to _____ upon qualification and acceptance.

Dated this 14ᵗʰ day of November, 2023

Elizabeth Sweeney



Clerk

CAUTION: See § 72-3-122, MCA (2005) on statute of limitations on probate of a Will. Editors express no opinion as to whether any statute of limitations applies to an intestate probate.

ORDER OF INFORMAL APPOINTMENT OF
PERSONAL REPRESENTATIVE IN INTESTACY -
PAGE - 2

§ 72-3-222, MCA (2005)

**Form 6.3**

The State of Montana )
                              :ss
County of _CASCADE_ )

I, _Stella M. Ereaux_, hereby accept the duties of Personal Representative of the intestate estate of _Louis J. Remillard_, deceased, and do solemnly swear that I will perform, according to law, the duties of Personal Representative of the intestate estate of _Louis J. Remillard_, deceased.

_____
(Signature of Personal Representative)

The State of Montana )
                              :ss
County of _CASCADE_ )

Signed and sworn to (or affirmed) before me on _1st_ day of _November_, 2023 by _Stella M. Ereaux_

_____
Print Name: _____
(Notarial Seal)                Notary Public of the State of Montana
                                Residing at: _____
                                My Commission Expires: _1/7/2026_

KAYRE CHATELLIER
Notary Public for the
State of Montana
Residing at GREAT FALLS, MT
My Commission Expires
January 7, 2026

LETTERS (for intestate estate) - PAGE - 2

District Judge Name
Court Name
Address
City, State, Zip
Phone#

STATE OF MONTANA } SS
County of Cascade
Form 6.3
I hereby certify that the letters to which this certificate is affixed is a true, correct and compared copy of the original on file in this office of the Clerk of the District Court, and that the date of appointment was November 14th 2023 and that the same are in full force and effect.
WITNESS my hand and the seal of the District Court of Cascade County this 14 day of November 23
TINA HENRY
Clerk of Court
Cascade County, Montana

MONTANA _____ JUDICIAL DISTRICT COURT,
Cascade COUNTY

IN RE THE ESTATE OF
Louis J. Remillard
Deceased.

Probate No. DDP-23-U2/2

**LETTERS**
**(FOR INTESTATE ESTATE)**

Application by Stella M. Ereaux for appointment as Personal Representative in intestacy of the estate of the above-named decedent, having been made and granted by Order in the above proceeding dated the 14th of NOV. 2023

Letters of appointment as such Personal Representative are hereby issued as provided by law.

WITNESS the Clerk of Court and the seal of the Court affixed this 14th day of November • 2023

(COURT SEAL)

Clerk of Court     Elizabeth Sweeney
By: _____
Deputy Clerk

COURT SEAL

LETTERS (for intestate estate) - PAGE - 1

Form 6.2

District Judge Name
Court Name
Address
City, State, Zip
Phone #

MONTANA ___8th___ JUDICIAL DISTRICT COURT,
___Cascade___ COUNTY

IN RE THE ESTATE OF                    Probate No. DDP -23-0272
Louis J Remillard
Deceased.

ORDER OF INFORMAL APPOINTMENT
OF PERSONAL REPRESENTATIVE IN
INTESTACY

The application of ___Stella M. Ereaux___ for the informal probate of the intestate Estate of the above-named decedent and the appointment of a Personal Representative, having been filed with the Clerk, and it appearing that the application is complete and contains the Applicant's oath or affirmation that the statements contained therein are true to the best of his knowledge and belief, the Clerk makes the following findings based upon said application:

1. ___Louis J Remillard___ died on ___August 17 20 23___, and at least 120 hours have elapsed since decedent's death.

2. The Applicant is an interested person as defined by §72-1-103 (25), MCA (2005).

3. The Application is complete and properly verified as required by law.

4. Venue is proper for the reason stated in the Application.

5. No Will has been offered for probate in this state or elsewhere, and the Applicant is not aware of any Will of the decedent.

6. Any notice required by §72-3-106, MCA (2005), has been given.

ORDER OF INFORMAL APPOINTMENT OF
PERSONAL REPRESENTATIVE IN INTESTACY -
PAGE - 1

§ 72-3-222, MCA (2005)

## Form 6.2

7. Applicant is entitled to be appointed Personal Representative in intestacy of the estate of the decedent because his/her priority is as stated in the application, and he/she is otherwise qualified.

NOW, THEREFORE, IT IS ORDERED as follows:

1. The application for informal appointment of Personal Representative is hereby granted, and ___Stella M. Ereaux___ is hereby appointed as Personal Representative of the Will and estate of the above-named decedent ☑ without bond ☐ upon giving bond in the amount of $_____.

2. Letters shall be issued to _____ upon qualification and acceptance.



Dated this 14ᵀᴴ day of November, 2023

Elizabeth Sweeney



COURT SEAL

Clerk

CAUTION: See § 72-3-122, MCA (2005) on statute of limitations on probate of a Will. Editors express no opinion as to whether any statute of limitations applies to an intestate probate.

ORDER OF INFORMAL APPOINTMENT OF
PERSONAL REPRESENTATIVE IN INTESTACY -
PAGE - 2

§ 72-3-222, MCA (2005)

Form 6.3

The State of Montana )
                                              :ss
County of _CASCADE_ )

I, _Stella M. Ereauy_, hereby accept the duties of Personal Representative of the intestate estate of _Louis J. Remillard_, deceased, and do solemnly swear that I will perform, according to law, the duties of Personal Representative of the intestate estate of _Louis J. Remillard_, deceased.

_____
(Signature of Personal Representative)

The State of Montana )
                                              :ss
County of _CASCADE_ )

Signed and sworn to (or affirmed) before me on _7th_ day of _November_, 2023 by _Stella M. Ereauy_

_____
Print Name: _____

(Notarial Seal)                Notary Public of the State of Montana
                                        Residing at: _____
                                        My Commission Expires: _1/7/2026_

KAYRE CHATELLIER
Notary Public for the
State of Montana
Residing at GREAT FALLS, MT
My Commission Expires
January 7, 2026

LETTERS (for intestate estate) - PAGE - 2



# Inspection of the Federal Bureau of Prisons' Federal Correctional Institution Sheridan

\* \* \*

EVALUATION AND INSPECTIONS DIVISION

24-070

MAY 2024

# Executive Summary



**The DOJ OIG's Inspections Program**

Between Monday, November 27, and Friday December 1, 2023, the Department of Justice (DOJ) Office of the Inspector General (OIG) conducted an unannounced, on-site inspection of Federal Correctional Institution (FCI) Sheridan in Oregon. The institution is composed of three sub-facilities: a medium-security prison, a minimum-security prison camp, and a detention center. All three of these facilities house male inmates

This was the third unannounced inspection of a Federal Bureau of Prisons (BOP) institution under the OIG's new on-site inspections program. The first two institutions we inspected, FCI Waseca and FCI Tallahassee, housed female inmates. We selected FCI Sheridan as the site of our third inspection because we wanted to better understand and assess the conditions of confinement for male inmates. We also note that the OIG's BOP Interdisciplinary Team (which facilitates inter-OIG collaboration on BOP oversight issues) contributed to the inspection team's site selection decision.

We identified significant issues at FCI Sheridan, many of which were consistent with BOP-wide issues on which we have made recommendations in prior work. Because those prior recommendations direct the BOP to address these issues at an enterprise level, we do not make new ones in this report but instead repeat our prior ones and highlight throughout this report how those prior recommendations relate to FCI Sheridan. Through our efforts to resolve those recommendations, we will monitor the BOP's efforts to address these issues at all of its institutions, including FCI Sheridan.

Our unannounced inspection identified several serious safety and security issues at FCI Sheridan affecting both employees and inmates. Most significantly, substantial shortages of Correctional Officers and healthcare workers—which is an issue at many BOP institutions—have created widespread and troubling operational challenges at FCI Sheridan that substantially impact the health, welfare, and safety of employees and inmates.

For example, healthcare staffing challenges seriously impact FCI Sheridan's ability to provide adequate healthcare to inmates. In particular, this affects the performance of routine, daily functions such as drawing blood for laboratory tests, triaging patient requests for care, and ensuring that medical equipment and supplies are ready to be used for routine care and in the event of a medical emergency. Especially alarming was our finding that the institution had a backlog of 725 laboratory orders for blood draws or urine collection and 274 pending x-ray orders. These backlogs cause medical conditions to go undiagnosed and leave providers unable to appropriately treat patients. Specifically, an FCI Sheridan physician told us that the backlog of laboratory orders for blood draws or urine collection has compromised his ability to treat patients and has prevented him from monitoring the effects of medication on his patients' kidney and liver functions. These limitations are concerning for the treatment of any medical condition, but especially concerning for the treatment of chronic conditions, such as diabetes and hepatitis C, that regularly affect inmates. We note that FCI Sheridan took action to decrease these backlogs after our on-site inspection and after we expressed concern about these issues to the BOP; as of May 2024, the backlog of laboratory orders stood at 44 and the backlog of pending x-ray orders stood at 84.

Delayed medical treatment can lead to more serious medical conditions for an inmate, as well as substantially increased costs for the institution. For example, we found that, just prior to our inspection, an inmate feigned a suicide attempt in order to receive medical attention for an untreated ingrown hair that had become infected. When finally examined after the feigned suicide attempt, he required hospitalization for 5 days to treat the infection. Separately, while not directly

related to staff shortages, we also observed a variety of potentially dangerous medication distribution practices.

We also found that, due to substantial staff shortages, FCI Sheridan did not always have available Correctional Officers to escort inmates to external medical providers. At the time of our inspection, 101 outside appointments had been canceled between January and November 2023 due to the lack of available employees to escort inmates to these appointments. We note that, after receiving a draft of the report, the BOP reported that 89 of the 101 consultations had been completed since our inspection.

Additionally, due to a critical shortage of dental equipment and supply items, dental care at FCI Sheridan was limited to intake examinations, clinical examinations, and walk-in clinic triage. As a result of these modified operations, in October 2023 approximately 350 inmates were on a waitlist for routine dental care and 41 percent had been on the waitlist for 2 years or more.

Further, we found that Psychology Services Department and Education Department staff shortages resulted in significant wait times for important programs, including 600 inmates waiting to participate in the first phase of the BOP's Resolve Program, a cognitive behavioral therapy program designed to address trauma-related mental health needs; 500 inmates waiting to participate in an anger management program; and 300 inmates waiting to participate in a foundational work skills class. Further, we found that more than 1,200 inmates had been determined by the BOP to have a need for programming to increase their ability to maintain employment upon release but only 58 were enrolled in a vocational training program.

We also were disturbed to find that serious shortages among FCI Sheridan employees who facilitate the BOP's Residential Drug Abuse Program (RDAP)—only 5 of 16 of these employee positions were filled at the time of our visit—have resulted in the institution being unable to offer the program to many eligible inmates who had been transferred from other institutions specifically to participate in FCI Sheridan's program. As a cumulative result of these issues, we found that FCI Sheridan has offered inmates limited opportunities to prepare for successful reentry into our communities. Three days after our inspection concluded, BOP Director Colette Peters suspended the RDAP at the FCI Sheridan's minimum-security prison camp.

In addition, FCI Sheridan's Correctional Officer vacancy rate has meant that institution management is not always able to fill all inmate-monitoring posts and therefore lacks the employees it needs to safely supervise inmates. As a result, inmates must routinely be confined to their cells during daytime hours and are therefore often unable to participate in programs and recreational activities. As we have detailed in our prior work, including our recent report on inmate deaths in custody, when inmates are not appropriately monitored the chance that they will engage in self-harm, violence, and other illicit activities increases.[1]

In an effort to staff correctional posts, institution leadership requires all Correctional Officers to perform mandatory overtime. Correctional Officers told us, consistent with information from our prior oversight work, that high levels of overtime can negatively affect morale and their attentiveness when supervising inmates. Institution management also requires non-correctional employees, many of whom facilitate or

---

[1] Appendix 2, Item III.

ii

teach inmate programming, to serve in correctional posts rather than attend to their regular duties. However, doing so may cause them to cancel classes, further limiting inmate access to programming.

During our inspection, we also found that FCI Sheridan did not centrally track the number of all allegations of inmate-on-inmate sexual misconduct reported to employees. As a result, we were unable to determine the total number of reported allegations of inmate-on-inmate sexual misconduct. Ultimately, the failure to accurately track these allegations undermines the ability of both FCI Sheridan and the BOP to collect data consistent with Prison Rape Elimination Act of 2003 (PREA) standards that would allow them to assess and improve the effectiveness of sexual misconduct prevention efforts.

Finally, whereas our prior BOP inspections found significant concerns relating to infrastructure, security cameras, and food service, we identified comparatively fewer concerns in these areas at FCI Sheridan. For example, we did not identify widespread infrastructure issues that were actively affecting the conditions of confinement for inmates. We did identify water pipe failures that caused occasional flooding in inmate areas, deteriorated building siding that caused water intrusion into inmate areas, and exposed electrical wires throughout the institution. In addition, we were told that many of the institution's systems, including heating and cooling systems, are approaching the end of their projected lifespan and need to be updated. Officials estimated the cost of this work to be $21.6 million.

## Report Highlights



**Safety, Security, and Healthcare**

**Significant staff shortages have cascading effects on institution operations.**
- Correctional Officer shortages require the institution to:
    - ➢ routinely use overtime, which can negatively affect employee attentiveness and therefore institution safety and security;
    - ➢ temporarily reassign non-Correctional Officers to Correctional Officer posts, negatively affecting their ability to perform their regular duties (e.g., teaching inmate programs); and
    - ➢ leave inmates with little or no monitoring.
- Staff shortages in the Health Services Department compromise FCI Sheridan's ability to provide adequate healthcare to inmates.



**Sexual Misconduct Reporting**

**FCI Sheridan did not centrally track the number of all allegations of inmate-on-inmate sexual misconduct reported to employees.**
- The failure to accurately track these allegations undermines the BOP's ability to collect data that would allow it to assess and improve the effectiveness of sexual misconduct prevention efforts under the PREA.



**Inmate Programming**

**Staff shortages limit opportunities for inmates to participate in programs designed to prepare them for successful reentry.**
- Shortages of drug treatment program employees resulted in the institution being unable to offer the RDAP to many eligible inmates who had been transferred from other institutions specifically to participate in FCI Sheridan's program.
- Long waitlists, some exceeding 500 names, delay inmate participation in trauma-related mental health, anger management, and work skills classes.



**Infrastructure**

**FCI Sheridan has many infrastructure needs that, if left unaddressed, may negatively impact the conditions of confinement for inmates and working conditions for employees.**
- Many of the institution's systems, including heating and cooling systems, are approaching the end of their projected lifespan and need to be updated.
- Officials estimated the cost of this work to be $21.6 million.

# Table of Contents

Introduction ...................................................................................................................................1

    FCI Sheridan ...........................................................................................................................1

    FCI Sheridan Staffing Challenges ...........................................................................................3

Inspection Results .........................................................................................................................4

    Safety and Security.................................................................................................................4

    Inmate Healthcare..................................................................................................................8

    Inmate Programming........................................................................................................... 13

    Use of Restrictive Housing .................................................................................................. 15

    Employee Misconduct.......................................................................................................... 18

    Sexual Misconduct .............................................................................................................. 19

    Physical Conditions and Infrastructure............................................................................... 20

    Food Service......................................................................................................................... 22

    Inmate Court Visits.............................................................................................................. 23

Conclusion ...................................................................................................................................25

Appendix 1:  Purpose, Scope, and Methodology .......................................................................27

    Standards ............................................................................................................................ 27

    Purpose and Scope ............................................................................................................. 27

    Inspection Methodology...................................................................................................... 27

Appendix 2:  DOJ OIG Related Work...........................................................................................29

Appendix 3:  BOP Policies Cited..................................................................................................31

Appendix 4:  The BOP's Response to the Draft Report ...............................................................32

Appendix 5:  OIG Analysis of the BOP's Response......................................................................34

# Introduction

This report details the results of the U.S. Department of Justice (DOJ) Office of the Inspector General's (OIG) unannounced inspection of a Federal Bureau of Prisons (BOP) prison, Federal Correctional Institution (FCI) Sheridan located in Sheridan, Oregon, which is approximately 50 miles south of Portland. FCI Sheridan is composed of three facilities, a medium-security prison, a Federal Detention Center, and a minimum-security prison camp, all of which house male adults. This is the third unannounced inspection under the OIG's new on-site inspections program. In May and November 2023, respectively, we issued separate reports detailing our inspections of FCI Waseca and FCI Tallahassee, both low-security female institutions with the latter home to an adjacent male detention center. We selected FCI Sheridan as the site of our third inspection because we wanted to better understand the conditions of confinement for male inmates and assess an institution of greater size than those we previously inspected.

The OIG conducted its unannounced, on-site inspection of FCI Sheridan between Monday, November 27, and Friday, December 1, 2023. While on site, we made physical observations; interviewed employees and inmates; reviewed security camera footage; and collected records related to inmate programming and education, institution staffing levels, conditions of confinement, inmate medical and mental healthcare, and employee and inmate misconduct, including sexual misconduct. We also made follow-up requests of the institution, BOP Western Region, and BOP Central Office for additional data, interviews, and documents, which we used to further inform our inspection (see Appendix 1 for more details on the methodology).



FCI Sheridan Main Entrance

Source: OIG, November 2023

## FCI Sheridan

FCI Sheridan's medium-security prison and minimum-security prison camp opened in 1989, and the detention center opened in 1995. Whereas the medium-security prison and minimum-security camp house inmates serving the pendency of their sentence, the Federal Detention Center houses inmates who are awaiting sentencing or transfer. FCI Sheridan leadership uses a centralized roster to assign employees to all three facilities. (For the remainder of this report, we refer to the overall institution as FCI Sheridan, the medium-security prison as the "MSP," the Federal Detention Center as the "FDC," and the minimum-security prison camp as the "Camp.")

FCI Sheridan is a Medical Care Level 2 and a Mental Health Care Level 3 institution. In the BOP, Medical Care Level 2 institutions should have the capabilities and resources to provide care for stable outpatients whose medical conditions can be monitored and managed through routine appointments. Mental Health Care

Level 3 institutions have the capabilities and resources to provide care for inmates who have complex, and usually chronic, mental health conditions that require frequent clinical contacts to maintain the stability of their condition.

As of November 28, 2023, the MSP housed 988 inmates and was at full capacity. The MSP has eight general population units and one Special Housing Unit (SHU). The general population housing units have two floors with double occupancy cells. Cells contain bunk beds, a sink, and a toilet. Cells remain unlocked during the day so inmates can use common shower and recreation areas. The SHU houses inmates that need to be separated from the general population and contains double occupancy cells with a sink and toilet. Inmates remain locked in these cells except for when they are escorted to shower and recreation areas.

At the time of our inspection, the FDC housed 271 inmates, approximately 97 percent of its physical capacity of 280. The FDC has two main housing units, and the interior conditions are similar to those of housing units at the MSP. The Camp housed 366 inmates, which was 95 percent of its physical capacity of 384. Unlike inmates housed at the MSP and the FDC, those at the Camp live in open concept living spaces. The living spaces are spread across two different housing buildings, and each living space contains bays with inmate bunk beds, as well as communal areas for bathrooms, showers, and recreation. The Camp

**FCI Sheridan: Institution Profile**

**Location**
Sheridan, OR

**Medical Care Level**
2 of 4

**Mental Health Care Level**
3 of 4

**Employees**
Total Positions: 357
On Board: 290
*81 Percent Filled*

| **MSP** | **FDC** | **Camp** |
|---|---|---|
| **Population** | **Population** | **Population** |
| Physical Capacity: 988 | Physical Capacity: 280 | Physical Capacity: 384 |
| Actual Headcount: 988 | Actual Headcount: 271 | Actual Headcount: 366 |
| *100% Capacity* | *97% Capacity* | *95% Capacity* |
| **Security Level** | **Security Level** | **Security Level** |
| Medium | Administrative | Minimum |
| **Housing Units** | **Housing Units** | **Housing Units** |
| 8 General Population Units and 1 SHU | 2 General Population Units | 2 Buildings with Open Concept Living Spaces |

As of November 28, 2023

Source: FCI Sheridan documentation

does not have a SHU; when institution employees must separate Camp inmates from the general population, they move them to the SHU inside the MSP.

At the time of our inspection, inmates at the MSP and Camp could participate in residential mental health and drug treatment programs, as well as FIRST STEP Act-required Evidence-Based Recidivism Reduction programming and Productive Activities. Given that most inmates at the FDC are housed there only on a

short-term basis, programming available to them is limited compared to that available to inmates housed at the MSP and Camp.

## FCI Sheridan Staffing Challenges

Like many BOP institutions, which are experiencing issues recruiting and retaining employees, FCI Sheridan was struggling to maintain a staffing complement consistent with the BOP's determination of the needs of the institution. Overall, FCI Sheridan had a total of 81 percent (290 of 357) positions filled as of November 2023. Staff shortages have particularly affected the Correctional Services Department, which is composed primarily of Correctional Officer positions. Correctional Officers are vital to the safety and security of the institution, as they are responsible for providing round-the-clock supervision of inmates. Specifically, FCI Sheridan had only 81 percent of its Correctional Services positions filled at the time of our inspection (see Figure 1). As we describe later in the report, we found that, due to staff shortages, in order to fully staff Correctional Officer posts the institution required significant use of overtime, as well as augmentation—a



**Figure 1**

**FCI Sheridan Staffing Level Overview**

Source: FCI Sheridan staffing data as of November 2023

staffing technique whereby non-Correctional Officer personnel are reassigned from their regular duties to serve in Correctional Officer posts. Even with the use of overtime and augmentation, we found that institution management is not always able to fill all Correctional Officer posts, which has caused inmates to be minimally supervised or, in certain instances, not supervised at all.

Moreover, we found that FCI Sheridan's staffing challenges were not limited to its Correctional Services Department. For example, FCI Sheridan's Health Services Department was 67 percent (18 of 27) filled at the time of our inspection, and we found that the staff shortage in this department has contributed to significant delays in the delivery of healthcare to inmates. We also found that only 5 of FCI Sheridan's 16 positions for drug treatment program employees were filled at the time of our inspection. This shortage significantly limited the institution's ability to offer drug treatment programs to eligible inmates. We discuss in greater detail how staffing issues affect inmate healthcare and inmate programming in the Inspection Results below.

3

# Inspection Results

## Safety and Security

We identified serious safety and security issues at FCI Sheridan. Most significantly, we found that, due to Correctional Officer shortages, institution management is not always able to fill all Correctional Officer posts, which has caused inmates to be minimally supervised or, in certain instances, not supervised at all. This condition creates a number of safety and security risks, including the risks of inmate self-harm; violence toward employees or other inmates; and other illicit activities, including the introduction and use of illegal drugs. FCI Sheridan's Correctional Officer shortage has further cascading effects on institution operations. Specifically, to decrease the risks associated with limited supervision, institution management has had to habitually confine (or lock down) inmates to their cells during daytime hours. This decision in turn prevents inmates from participating in institution programming and recreational activities. Additionally, to fill as many Correctional Officer posts as possible, institution leadership mandates Correctional Officers to perform high levels of overtime and requires non-Correctional personnel to temporarily stop performing their regular duties to fill Correctional Officer positions through a practice known as augmentation. According to FCI Sheridan employees, the excessive use of these staffing techniques has left them exhausted (See Figure 2).

## Correctional Officer Staffing Deficiencies

Correctional Services Department employees, who are primarily Correctional Officers, are responsible for the daily management and supervision of inmates and the

### Figure 2

### FCI Sheridan Correctional Officer Recruiting and Retention Efforts

The institution has undertaken efforts to recruit and retain Correctional Officers. Specifically:



FCI Sheridan holds monthly recruitment events and recruits from local universities.



FCI Sheridan offers retention incentives of $10,000 or 25 percent of base pay (whichever is higher) for all employees who have completed 1 year of employment.



The week following our inspection, FCI Sheridan onboarded 11 new Correctional Officers.

Despite these efforts, FCI Sheridan management said that it was difficult to find talented individuals willing to work in Correctional Officer positions, largely due to the lack of competitive salaries for new recruits and the slow hiring process.

Source: FCI Sheridan management

implementation of policies and procedures to maintain a safe and secure environment for inmates and employees. At the time of our inspection, FCI Sheridan's Correctional Services Department was staffed at 81 percent (117 filled vs. 145 authorized positions). Vacancies in Correctional Officer positions make it difficult for an institution to provide round-the-clock supervision of inmates. To compensate for vacancies in these critical positions at FCI Sheridan, institution management has adopted two stopgap measures used widely across the BOP to maintain coverage of correctional posts: (1) use of mandated and voluntary overtime and (2) temporary assignment of non-Correctional Officer personnel into Correctional Officer positions, a practice known as augmentation. Through these two measures, FCI Sheridan employees performed more than 88,400 hours of work covering Correctional Officer posts—equivalent to approximately 43 full-time positions—from November 2022 to November 2023.

Even if FCI Sheridan's Correctional Services Department filled all of its vacancies, we question whether it would be able to appropriately staff all three facilities without the continued use of overtime and/or augmentation. At the time of our inspection, 117 of 145 Correctional Services Department positions had been filled, which amounts to 28 vacancies. However, in the year prior to our inspection, FCI Sheridan management used overtime and augmentation to fill the equivalent of approximately 43 of these full-time positions.[2] Given that the extent of staffing gaps the institution covered through overtime and augmentation represents 15 positions greater than its official number of vacancies less than a year later, we believe that the 145 positions officially allocated to the Correctional Services Department may be too low.

Indicating the potential need for more authorized positions in the Correctional Services Department, we found that, even with the use of overtime and augmentation, institution management still cannot provide round-the-clock coverage of all Correctional Officer posts in medium-security prison (MSP) inmate housing units. This negatively affects the conditions of confinement for MSP inmates mostly during the day, when they must be confined to their cells to mitigate the security concerns associated with limited supervision. Due to this daytime confinement, they are unable to access common and outdoor recreation areas and they cannot attend programs. As we discuss in the Inmate Programming section of the report, this issue, combined with the effects of low staffing in the departments that facilitate inmate programming, as well as the routine augmentation of employees in those departments, limits the opportunities for FCI Sheridan inmates to participate in programs designed to prepare them for successful reentry into our communities.

The effects of low Correctional Officer staffing also create serious safety concerns. FCI Sheridan employees told us that excessive mandated overtime has left them exhausted. As a result, we believe that they may become less observant when conducting inmate-monitoring rounds. We independently reviewed MSP general population housing unit video footage from an evening just prior to our inspection and found that Correctional Officers conducted less than half of the required twice-hourly rounds in three housing units between 9:30 p.m. and 6 a.m. The issue of little or no inmate supervision is not limited to the MSP. In fact, we learned that on certain evenings the sole employee assigned to supervise the Camp may need to respond to the MSP or FDC in the event of an emergency. When this happens, Camp inmates are left unsupervised. Although we did not collect evidence to determine the exact number of times this has occurred, FCI Sheridan employees told us that it happens regularly.

The statements of FCI Sheridan employees and our observations of incomplete inmate-monitoring rounds are consistent with findings in our prior work, in which we reported that staff shortages and excessive use of overtime and augmentation decrease Correctional Officer attentiveness. We have also reported that the failure to complete inmate-monitoring rounds can increase the risks of inmate self-harm; violence toward employees or other inmates; and other illicit activities, including the introduction and use of illegal drugs.

---

[2] See past OIG work on the BOP's use of overtime at Appendix 2, Item IV.

**Relevant Prior OIG Work and Related Recommendations: Correctional Officer Shortages Affecting Safety and Security**

The OIG's June 2023 report on its investigation and review of the BOP's custody, care, and supervision of Jeffrey Epstein at Metropolitan Correctional Center New York found that staffing deficiencies at the institution contributed to the failure of its employees to perform inmate-monitoring rounds during the evening of Epstein's death. A 2024 OIG report on inmate deaths in custody also found that the failure to appropriately complete inmate-monitoring rounds was a contributing factor to 86 BOP inmate deaths, including Epstein's, between 2014 and 2021.

To address the effects of staff shortages on institution safety, in the Epstein report the OIG recommended that the BOP continue to develop and implement plans to address staff shortages at its prisons. As of the publication of this report on FCI Sheridan, this recommendation remains open.

See Appendix 2, Items III and V, for more information about these reports.

## Contraband

The introduction of contraband, including illicit drugs, is a persistent and significant challenge for FCI Sheridan. This challenge is most acute at the Camp because, unlike at the other two FCI Sheridan facilities, inmates can freely move throughout the Camp during the day. Additionally, FCI Sheridan's outer perimeter closest to the Camp is marked by a fence that is easily accessible from a municipal park, which would make it easy for associates of inmates to throw contraband over the fence for inmates to retrieve. Further, it is much easier for inmates to retrieve such contraband in those situations, described above, when they are left unsupervised.

FCI Sheridan employees also told us that inmates at all three facilities receive contraband through the mail. While mail room employees screen incoming inmate mail and packages, it is difficult for them to identify all illicit drugs being sent to the institution due to the novel ways some drugs can be concealed. For example, synthetic cannabinoids can be sprayed onto paper, while buprenorphine and naloxone can be transmitted via small, dissolvable strips that can easily fit behind a stamp or in the binding of a book. In our recent report on BOP inmate deaths in custody, we described how the BOP is piloting a program in which employees digitally process mail (by scanning) at two institutions with a high incidence of drug overdoses. The BOP stated that this method eliminated synthetic and opioid drugs from coming into the facilities via general nonlegal mail but

**Commonly Introduced Contraband Drugs**

Employees told us that synthetic cannabinoids and illicitly acquired and combined buprenorphine/naloxone were commonly introduced into the institution.

**Synthetic Cannabinoids** (colloquially known as K2 or spice) do not have a medical purpose. They are a category of synthetic drugs that mimic tetrahydrocannabinol, or THC, the main ingredient in marijuana. Abuse of these products can cause severe side effects, including nausea, vomiting, agitation, anxiety, seizures, stroke, coma, and death by heart attack or organ failure. Typically, synthetic cannabinoids are sprayed onto plant matter and smoked.

**Buprenorphine and naloxone** are medications that can be combined and ingested orally through pills or dissolvable strips. When used appropriately, they can help treat opioid abuse disorder by helping patients manage withdrawal symptoms and reduce cravings. Though the "high" is less intense than the high from opioids, "the medication can still produce a euphoric effect, as it still acts on the same opioid receptors in the brain and creates a flood of dopamine in the brain."

Sources: Interviews with FCI Sheridan employees, National Institutes of Health, and the Drug Enforcement Administration



An Estimated 62 Grams of
Methamphetamine Seized from
Inmate Mail

Source: OIG, November 2023

acknowledged that mail digitization could risk burdening employee resources and would require significant budget resources that have not yet been allocated.[3]

We also found that not all contraband mailed to the institution is concealed in a novel fashion; for example, mail room employees found 62 grams of methamphetamine just prior our inspection. Finally, we note that BOP mail room employees implement safety precautions to limit exposure to drugs; however, due to the amount of illicit drugs in the institution, some non-mail room employees told us that they were concerned about potentially being exposed to contraband substances that could cause severe medical complications if touched.

## Security Cameras

Functional security cameras that produce clear footage are an important tool to help the BOP maintain institutional safety and security and provide evidence in criminal and disciplinary investigations. During our review of security camera footage and the associated software management system at FCI Sheridan, we found that the footage was of high quality and the software management system was easy to use. We were able to access footage captured more than 2 months prior to our inspection. At the time of our inspection, FCI Sheridan's MSP had 154 cameras, the Federal Detention Center (FDC) had 50, and the Camp had 21. We note that 60 of these 225 cameras are digital and the remainder are analog. A BOP employee responsible for FCI Sheridan's security camera system estimated that FCI Sheridan will upgrade the remaining analog cameras to digital cameras over the next 2 years. While institution investigative employees told us that they are satisfied overall with the quality and coverage of security cameras, we observed several blind spots, at both the MSP and the FDC, where unwitnessed assaults could potentially take place. FCI Sheridan employees told us that they have received funding to purchase and install additional cameras to increase coverage throughout all three facilities.

---

[3] Appendix 2, Item III.

### Relevant Prior OIG Work and Related Recommendations: Security Cameras

The OIG has long identified insufficient camera coverage and recording system storage limitations as challenges, both for the BOP, throughout its institutions, and for the OIG in its own investigative capacity. In a June 2016 report, we found that "deficiencies within the BOP's security camera system have affected the OIG's ability to secure prosecutions of employees and inmates in BOP contraband introduction cases, and these same problems adversely affect the availability of critical evidence to support administrative or disciplinary action against employees and inmates." Following the issuance of our 2016 report, the BOP completed a multiyear update to cameras at 45 institutions; however, serious issues with the BOP's security camera systems remained. In October 2021, we issued a Management Advisory Memorandum finding that the BOP's camera systems continued to need significant infrastructure and equipment upgrades. In that memorandum, we also found that the BOP lacked a comprehensive strategic plan to address the significant deficiencies of its institution camera systems.

As a result of our finding from the 2021 Management Advisory Memorandum, we recommended that the BOP develop a comprehensive strategic plan for transitioning to a fully digital security camera system. As of the publication of this report on FCI Sheridan, this recommendation remains open.

We also note that Congress passed, and the President signed, the Prison Camera Reform Act of 2021, which requires the BOP Director to ensure that BOP facilities have security camera coverage and capabilities necessary to ensure the documentation and accessibility of video evidence pertaining to misconduct, maltreatment, or criminal activity within correctional facilities.

See Appendix 2, Items VI and VII, for more information about these reports.

## Inmate Healthcare

At the time of our inspection, FCI Sheridan's Health Services Department was staffed at 67 percent (18 filled positions out of 27). Employee shortages were most acute among nurses, with only three of seven positions filled. Additionally, only one of three mid-level provider positions were filled, two of three physician positions were filled, and the institution was without a phlebotomist to draw blood for laboratory tests. According to employees in the Health Services Department, low department staffing levels make it difficult to perform routine, daily functions, such as drawing blood for laboratory tests, triaging patient requests for care, and ensuring that medical equipment and supplies are ready to be used for routine care and in the event of a medical emergency. We also note that, due to overall institution staff shortages, particularly those in the Correctional Services Department, FCI Sheridan did not always have employees available to escort inmates to community-based medical providers, which resulted in 101 canceled inmate medical appointments between January and November 2023. Finally, and while not directly related to staff shortages in the Health Services Department, we also observed a variety of potentially dangerous medication distribution practices.

## Backlog of Laboratory Tests

At the time of our inspection, FCI Sheridan had been without a phlebotomist, a medical professional responsible for drawing blood samples and preparing the samples for testing, since March 2022. As a result, FCI Sheridan had a backlog of 725 laboratory orders for which blood had not yet been drawn or urine collected. According to Health Services Department internal meeting minutes from October 2023, the "delay in blood work collection is delaying patient care and is a liability for the department." Further, the minutes specify that "medical conditions are going undiagnosed, and providers are left unable to treat patients appropriately." One FCI Sheridan physician told us that the backlog has compromised his ability to treat patients and has prevented him from monitoring the effects of medication on his patients' kidney and liver functions. These limitations are

concerning for the treatment of any medical condition, but especially concerning for the treatment of chronic conditions, such as diabetes and hepatitis C, that regularly affect inmates.

We note that, in the event of an acute medical issue, other clinical employees can draw inmate blood for laboratory tests but do not routinely perform this task given their other responsibilities. Further, the BOP's Western Regional Office has been aware of the phlebotomist vacancy and the resulting backlog and has attempted to triage it by temporarily assigning employees from other BOP duty locations to FCI Sheridan to draw blood for laboratory tests. Specifically, between October 2022 and September 2023, employees were deployed five times to FCI Sheridan to work a total of 40 days to address the backlog. Notwithstanding this effort, the large number of backlogged laboratory tests indicated a need for an on-site employee to both clear the existing backlog and ensure that the Health Services Department can keep up with the demand for laboratory tests in the future. Following our on-site visit in November 2023, during which we expressed concern about this backlog, FCI Sheridan hired an on-site phlebotomist to address the backlog of laboratory orders; in May 2024, the BOP reported that the backlog stood at 44—a 94 percent decrease.

---

**Relevant Prior OIG Work: Medical Personnel Shortages**

Medical personnel shortages have been a long-standing challenge for the BOP. In a March 2016 DOJ OIG report, we found that medical personnel positions were filled at only 83 percent across the BOP. As we observed during our inspection of FCI Sheridan, the BOP's medical personnel vacancies persist. According to a September 2023 Pandemic Response and Accountability Committee report to which the DOJ OIG contributed, at that time the BOP's medical personnel shortage stood at 82 percent. That report detailed a variety of contributing factors, including noncompetitive pay, limited career advancement opportunities, and the additional stressors and responsibilities associated with working in a correctional setting compared to those associated with working in the community. The report also detailed how these shortages contributed to decreases in patient satisfaction and delays in routine and preventive care during the coronavirus disease 2019 (COVID-19) pandemic. As noted previously, the OIG's Epstein report recommended that the BOP continue to develop and implement plans to address staff shortages at its prisons, including medical staff shortages, and, as of the publication of this report on FCI Sheridan, that recommendation remains open.

See Appendix 2, Items VIII and IX, for more information about these reports.

---

### Requesting and Accessing Care

Due to a variety of reasons, FCI Sheridan inmates may have difficulty requesting and accessing medical care for routine conditions. The most common way inmates would access medical care would be to visit the walk-in clinic at their facility. However, due to a shortage of nurses, who initially triage inmate medical conditions, the Health Services Department is unable to meet its internal goal of offering a walk-in clinic 4 days a week. According to Health Services Department internal meeting minutes, this negatively affects the quality of care the department provides to inmates.

On days that the walk-in clinic is not offered, inmates can submit a request for medical attention through an inmate computer; however, given routine lockdowns, particularly at the FDC and MSP, inmates housed there may be unable to access computers, located in common areas, when they need to request medical attention. If unable to attend a walk-in clinic or access an inmate computer, inmates can provide a paper request to an FCI Sheridan employee; however, we learned that Health Services Department employees are not taking appropriate steps to ensure that paper requests are assessed in a timely manner, or at all.

9

Specifically, Health Services Department employees told us that paper requests accumulate in medical offices and are not reconciled with scheduled appointments. Because Health Services Department employees subsequently shred paper requests, neither FCI Sheridan nor the OIG can determine whether all inmates who request care are afforded an opportunity to meet with a provider.

Illustrative of what can happen if a routine medical condition is not treated in a timely manner, we learned that a Special Housing Unit (SHU) inmate admitted to having feigned a suicide attempt (he placed a fabric noose around his neck) in order to force institution employees to provide medical attention for an ingrown hair that became infected just prior to our inspection. When he was examined following the feigned suicide attempt, swelling on his face had become so severe that he needed to be hospitalized for 5 days. We observed video of his medical examination and found it disturbing that an inmate experienced such a readily discernable medical condition in an environment like a SHU, where Correctional Officers are required to perform twice-hourly rounds to observe inmate activity and a Health Services Department clinical employee is required to perform daily rounds to assess inmate health.

### Delays in Medical and Dental Care Due to Lack of Medical Equipment and Supplies

On Tuesday, November 28, 2023, when touring the MSP room that clinical employees use to treat inmates with emergency medical conditions (referred to as the trauma room), we found that the room's oxygen tank was empty. Despite employees notifying Health Services Department leadership of the issue, the tank was not replaced until Friday, December 1, 2023. During the 3-day period before the oxygen tank was replaced, had an MSP inmate required supplemental oxygen, a replacement tank would have had to be brought from elsewhere in the Health Services Department, potentially delaying lifesaving oxygen administration. We note that, during those 3 days, clinicians continued to evaluate MSP inmates who had emergency medical conditions. The absence of supplemental oxygen in FCI Sheridan's MSP trauma room relates to a broader issue that the OIG identified in a February 2024 report on inmate deaths in custody.[4] In that report, we found that, when responding to medical emergencies, BOP employees did not always bring or use appropriate medical equipment. Given that mere seconds in response time can potentially mean life or death for afflicted inmates, the availability and use of appropriate medical equipment, including supplemental oxygen, is paramount to ensuring that inmates experiencing an emergency have the best chance of a positive medical outcome.

Ensuring that oxygen tanks are available and filled is one element of a BOP requirement to daily determine whether the trauma room is supplied and equipped to manage a medical emergency.[5] According to Health Services Department internal meeting minutes dated October 23, 2023, trauma room checks were not being completed in the trauma rooms at all three FCI Sheridan facilities. Further, upon our review of trauma room check logbooks at the MSP, we found that trauma room checks had not been recorded as complete since April 2022. The internal department meeting minutes indicate that trauma room checks were not being completed due to a lack of staffing within Health Services, and the Health Services Administrator told us that such checks are "something that easily falls to the wayside when you're overwhelmed with other tasks that need to be completed."

---

[4] Appendix 2, Item III.

[5] Appendix 3 (Patient Care).

In addition to the unavailability of filled oxygen tanks in the MSP trauma room, we found additional medical equipment operational issues that potentially affect inmate care. Specifically, two of FCI Sheridan's x-ray machines were nonoperational: the machine at the MSP since July 2022 and the machine at the FDC since December 2022. As a result, the institution had 274 pending x-ray orders at the time of our inspection. Similar to issues caused by the laboratory testing backlog, the backlog of x-ray orders makes it difficult to diagnose and address inmate health issues in a timely manner. We expressed our concerns about this backlog at the time of our inspection, and we note that, after receiving a draft of the report, the BOP reported that it took multiple steps to address the backlog of x-ray orders, including assigning temporary duty employees to FCI Sheridan to perform x-rays and deploying a mobile x-ray machine to the institution. As a result, the BOP reported that as of May 2024 the backlog was reduced to 84—a 69 percent decrease.

Additionally, due to what the BOP's Western Region Chief Dentist described as a critical shortage of dental supply items, the Chief Dentist recommended that FCI Sheridan's dental operations be significantly modified. As a result, dental care at FCI Sheridan is limited to intake examinations, clinical examinations, and walk-in clinic triage. This means that inmates could not receive routine care such as a teeth cleaning, cavity filling, or root canals. Due to these modified operations, as of October 2023 approximately 350 inmates were on a waitlist for routine dental care, 41 percent of whom had been on the waitlist for 2 years or more. In the event of an oral health emergency, inmates are transferred to the hospital or other community care; however, doing so creates a logistical burden for the already short-staffed institution as employees must escort the inmates to their outside medical visits. It also creates a financial obligation for the BOP that it otherwise could avoid if FCI Sheridan's dentist was able to address the issue at the institution. Finally, we note that, at the time of our inspection, 30 dental intake examinations for newly incarcerated inmates had not been completed within the 30 days prescribed by BOP policy.[6]

### Relevant Prior OIG Work and Related Recommendations: Availability of Medical Equipment and Supplies

The lack of supplemental oxygen in the MSP trauma room, as well as other medical equipment and supply issues at FCI Sheridan, represents a broader issue we identified in a February 2024 report on BOP inmate deaths in custody. In that report, we found that, when responding to medical emergencies, BOP employees did not always bring timely or use appropriately medical equipment and supplies such as automatic external defibrillators (AED), gurneys, and backboards. We also identified deficiencies with the availability and administration of naloxone, an opioid overdose reversal medication. Given that mere seconds in response time can potentially mean life or death for afflicted inmates, the availability and use of appropriate medical equipment is paramount to ensuring that inmates experiencing an emergency have the best chance of a positive medical outcome.

As a result of the February 2024 report's findings, we recommended that all employees be trained on AED use and that AEDs be strategically placed at each BOP institution, that each institution has a sufficient number of maneuverable gurneys to provide proper medical response during inmate transport, and that employees receive both initial and refresher naloxone training and are prepared to administer it on an unresponsive inmate suspected of having experienced a drug overdose. As of the publication of this report on FCI Sheridan, these recommendations remain open.

See Appendix 2, Item III, for more information about this report.

---

[6] Appendix 3 (Dental Services).

## Backlog of Outside Medical Visits

When inmates require nonemergency medical treatment beyond that which can be performed at FCI Sheridan, inmates must be scheduled to see an outside medical provider. At the time of our inspection, BOP medical records indicated that 500 outside medical appointments that had been ordered for inmates were yet to be scheduled. After receiving a draft of the report, the BOP told the OIG that the list of outstanding appointments included information about appointments that had already been completed or for which an inmate decided they no longer wanted the appointment. FCI Sheridan updated its medical records system to reflect these administrative changes and reported that the actual backlog, at the time of our inspection, of unscheduled outside medical appointments was 387. We also identified two contributing factors for the backlog: first, medical providers canceled appointments; second, FCI Sheridan had difficulties finding employees to escort inmates to scheduled appointments. Illustrative of these issues, between January and November 2023, 73 scheduled consultations were canceled by medical providers and 101 scheduled consultations were canceled because FCI Sheridan did not have a sufficient number of employees available to escort an inmate on the day of his appointment. While inmate medical escort responsibilities are not reserved exclusively for Correctional Officers, they are the employees at FCI Sheridan most commonly assigned to serve as medical escorts. Therefore, these cancellations, and the resulting delays in inmate medical care, are another cascading effect of the Correctional Officer shortages we described in the Safety and Security section of this report. We note that, after receiving a draft of the report, the BOP reported that 89 of the 101 consultations that had been canceled, due to availability of employees to escort inmates, had been completed since our inspection.

> **Relevant Prior OIG Work and Related Recommendations: Canceling and Rescheduling Outside Medical Visits**
>
> In a March 2022 audit report on the BOP's use of comprehensive medical services contracts to facilitate outside medical care for inmates, we found that, due to the limited availability of employees to escort inmates, the BOP was not always able to transport inmates to scheduled outside medical appointments. BOP officials also told us that appointments are rescheduled for other unanticipated reasons, such as inmate refusal to attend the appointment, illness of the inmate, or rescheduling required by the medical provider. During our audit, we found that the BOP does not adequately track canceled or rescheduled inmate appointments, and we were unable to determine the effect these cancellations and rescheduling had on the delivery of timely medical care to inmates. As a result, we recommended that the BOP implement a reliable, consistent process throughout all BOP facilities to monitor and analyze wait times for inmates' outside appointments and the causes for canceled or rescheduled appointments in order to ensure that inmates receive timely medical care. As of March 2024, this recommendation remains open.
>
> See Appendix 2, Item X, for more information about this report.

## Potentially Dangerous Medication Distribution Practices

We identified a number of practices that were potentially dangerous and in violation of BOP policy when we observed the distribution of medication to inmates, a process known as "pill line," at all three FCI Sheridan facilities. According to BOP policy, institutions must "ensure that the medications are stored in appropriate packaging and clearly labeled until administration" and must "identify each patient by examining two forms

12

of identification."[7]  However, we found the following examples of noncompliance among Health Services Department employees:

- They removed medication from its packaging hours before the next pill line was set to commence. This practice alone is a violation of policy and increases the risk of administration errors.  However, the risk of an administration error becomes even greater because the employee who removes the medication from the packaging is not always the employee who later dispenses the medication.

- They reused the same bag when crushing different medications.  This can cause drug cross-contamination, which can cause an inmate to have adverse reaction to the contaminated medication.

- They did not consistently identify each patient by examining two forms of identification before dispensing medication to them.

We also determined that drug administration issues were neither limited to the period of our inspection nor unknown to Health Services Department leadership.  We reviewed quarterly reports generated by department employees and circulated to department leadership and found that, between January 2023 and September 2023, the department self-identified multiple medication administration errors, including two inmates receiving an extra and unnecessary injection of a prescribed medication and an inmate being injected with the incorrect type of medication to address his opioid abuse disorder.

## Inmate Programming

Employee shortages in the Psychology Services and Education Departments, as well as the augmentation of non-custody employees into Correctional Officer posts, created significant backlogs for inmate programs. These backlogs are further exacerbated when inmates must be confined to their cells and are thus unable to attend classes.  As a cumulative result of these issues, FCI Sheridan offered inmates limited opportunities to prepare for successful reentry into our communities, which is inconsistent with the goals of the FIRST STEP Act of 2018.  The most concerning example of this was that more than 70 Camp inmates were unable to participate in the BOP's Residential Drug Abuse Program (RDAP), despite many inmates having been expressly transferred to FCI Sheridan to participate.

---

[7] Appendix 3 (Pharmacy Services).

## Drug Abuse Programming

### Residential Drug Abuse Program

RDAP is a 9-month program designed to help inmates address substance abuse disorder. Each RDAP cohort is composed of approximately 24 inmates. Upon successful program completion, inmates with no histories of violent offenses may earn up to a 1-year reduction in their sentence length. As of September 2023, the BOP reported that 70 of its institutions, including FCI Sheridan, offered RDAP.

Source: BOP

At the time of our inspection, FCI Sheridan's ability to offer RDAP and other non-residential drug treatment programs was seriously limited because only 5 of 16 positions were filled for drug treatment program employees in the Psychology Services Department.[8] This limitation most acutely affected 70 inmates at the minimum-security Camp who were waiting to begin the program at the time of our inspection. Many of these inmates had been transferred from other institutions to participate in the RDAP and were frustrated that they had been moved farther from their homes and families only to arrive at Sheridan and learn that the institution was struggling to offer the program. Some inmates also told us that their release dates were approaching and they were concerned that they would be released without being able to participate fully in the program and gain all of its therapeutic benefits. Other inmates complained that they may not be able to take advantage of all 12 months of the sentence reduction credit they would earn by completing the program because they would complete it with less than 12 months remaining on their sentence. As a way to express their frustration with the situation, Camp inmates modified a Halloween decoration, shown in the image on the right.

During our inspection, institution leadership told us that, due to the persistent challenges of hiring drug treatment program employees, they had submitted a request through the BOP's Western Regional Director to suspend the RDAP program at the Camp. Three days after the on-site portion of our inspection concluded, FCI Sheridan received approval from the BOP Director to suspend the RDAP at the Camp. During a follow-up call in January 2024 with the Western Regional Director, we learned that RDAP-eligible Camp inmates would be transferred to other BOP institutions that offer the RDAP; as of March 1, 2024, over 80 percent of those had been transferred.



A Halloween Decoration at the Camp

Source: OIG, November 2023

## Psychology Services and Education Department Programming

Other inmate programs, in addition to drug abuse treatment programs, are primarily administered by the Psychology Services and Education Departments. However, 3 vacancies in the Psychology Services Department (in addition to 11 vacancies among drug treatment employees), as well as 3 vacancies in the Education Department, limited program offerings and contributed to waitlists. The availability of programs is

---

[8] Appendix 3 (Psychology Treatment).

further limited by factors, including the routine use of augmentation to assign non-Correctional Officers to Correctional Officer posts, as well as the restriction of inmates to their cells, both of which we described above.

At the time of our inspection, waitlists for inmate programs were lengthy.  For example, we found that:

- over 600 inmates were waiting to participate in the first phase of the BOP's Resolve Program, a cognitive behavioral therapy program designed to address trauma-related mental health needs;

- over 500 inmates were waiting to participate in an anger management program; and

- over 300 inmates were waiting to participate in a foundational work skills class.

Further, skills-based vocational trainings at FCI Sheridan were limited; we found that, when assessing inmate needs to reduce recidivism, the BOP determined that more than 1,200 inmates at the MSP and Camp needed programming to increase their ability to maintain employment upon release; however, at the time of our inspection, only 58 were enrolled in a vocational training program (57 in a carpentry program and 1 in an electrician apprenticeship) and 92 were participating in the foundational work skills class.  After receiving a draft of this report, in April 2024, the BOP reported that it had started a welding program at FCI Sheridan and that the number of inmates enrolled in vocational programs had increased to a total of 78 participants (52 in a carpentry program, 20 in a welding program, and 6 in varied vocational apprenticeships).  The BOP also reported that the number of inmates in the foundational work skills class had decreased to 83.  Further, the BOP reported that it was in the process of establishing a horticulture program but that it was not yet open for enrollment.

We note that the Psychology Services Department did have sufficient employees to administer a program of note:  the BOP's Mental Health Step Down Program.  Step Down is a unit-based program through which inmates with severe mental illness receive intensive cognitive and behavioral therapies to help them address their mental health issues, minimize their need for inpatient hospitalization, and function in the general inmate population.  At the time of our inspection, 53 inmates were participating in the program and FCI Sheridan was 1 of only 5 BOP institutions that offered this program.

## Use of Restrictive Housing

At the time of our inspection, 90 inmates were in restrictive housing in FCI Sheridan's SHU.  The average amount of time these inmates were housed in the SHU was 54 days.  Of the 90 inmates, 34 had been housed in the SHU for less than 20 days while 18 had been housed there for at least 100 days.  See Figure 3 below for a more detailed analysis of the durations that FCI Sheridan inmates were housed in the SHU.

15

**Figure 3**

**FCI Sheridan Inmates in Restrictive Housing and Duration of Their Stay as of November 28, 2023**



Source:  FCI Sheridan records as of November 28, 2023

Inmates are generally housed in the SHU if they:

- are suspected of having committed serious misconduct and are awaiting the completion of an investigation and disciplinary hearing;

- are serving a disciplinary sanction after having been found to have committed misconduct at the completion of an investigation and disciplinary hearing;

- have been assessed by employees to pose a safety risk to the institution and are awaiting transfer to another institution (certain inmates in this status may have already completed their disciplinary sanction); or

- request, or are determined by employees, to need to be separated from another inmate or employee for their own safety (commonly referred to as protective custody).

16

SHU inmates are generally double-celled; but FCI Sheridan employees told us that in certain situations SHU inmates are single-celled. These situations include when there is an odd number of inmates in the SHU or when an inmate must be separated for protective custody. We also found that, due to capacity issues in the SHU, inmates may be temporarily single-celled in a holding cell with only a portable commode and portable urinal. At the time of our inspection, five SHU inmates were single-celled. The BOP recommends against single-celling, noting that it increases the risk of inmate suicide. All SHU single-cell decisions must be approved by the Warden.

Similar to inmates in general population housing units, we found that SHU inmates are not always receiving recreation opportunities. According to BOP policy, SHU inmates have an opportunity for at least 5 hours per week of exercise outside their cells.[9] To do so, Correctional Officers must escort an inmate from his cell to the SHU recreation area. However, a SHU Correctional Officer told us that, due to staff shortages, Correctional Officers cannot always ensure that inmates in the SHU have the opportunity to participate in 5 hours of recreation per week. Further, multiple SHU inmates communicated their concerns regarding the lack of recreation opportunities when OIG employees toured the SHU. See the image on the right of an inmate's handwritten note requesting recreation access.



A SHU inmate wedged a handwritten note through his cell door to request "yard." In prison parlance, "yard" is a term for recreation.

Source: OIG, November 2023

---

[9] Appendix 3 (Special Housing Units).

**Relevant Prior OIG Work and Related Recommendations:  Single-Celling of Inmates in Restrictive Housing**

In a 2017 report that evaluated the BOP's use of restrictive housing for inmates with mental illness, we found that placement in restrictive housing, even for short periods of time, can be particularly harmful for inmates' mental health.  The report found that the BOP was not tracking inmates' single-cell confinement or assessing cumulative time that inmates spent in restrictive housing and that its policy neither limited the length of time inmates spent in restrictive housing nor defined or addressed extended placement in restrictive housing.  We recommended that the BOP establish in policy the circumstances that warrant the placement of inmates in single-cell confinement, as well as tracking all inmates in single-cell confinement and monitoring the amount of time that inmates with mental illness spend in restrictive housing, including single-cell confinement.  We also recommended that the BOP define and establish in policy extended placement in measurable terms, as well as evaluating and limiting as appropriate the consecutive amount of time that inmates with serious mental illness may spend in restrictive housing.

More recent OIG work has shown how single-celling presents a significant risk of inmate suicide.  A February 2024 OIG report on issues surrounding inmate deaths in BOP institutions found that more than half (102 of 187) of the BOP inmates who died by suicide between fiscal years 2014 and 2021 were single-celled at the time of their deaths.  The report found that suicide risk is further compounded when inmates are single-celled while in restrictive housing settings such as a SHU; 86 of the 187 suicides occurred in a restrictive housing setting, and over two-thirds (60 of 86 suicides) happened while the inmate was single-celled in a restrictive housing setting.  A 2023 capstone review of the BOP's response to the COVID-19 pandemic found that seven BOP inmates died by suicide during a 14-month period while housed in single-cell confinement in quarantine units related to COVID-19.  In the capstone report, we recommended that the BOP thoroughly assess single-celling policies and processes (including those applicable to inmates housed in quarantine and medical isolation units and to inmates vulnerable to suicide) and ensure that actions, including any policy revisions, the BOP takes to close the two open recommendations from our 2017 restrictive housing report that reference single-celling also apply to single-celling during quarantine and medical isolation.

In March 2024, the BOP updated its SHU policy to require BOP employees to place SHU inmates with a cellmate unless there are unique circumstances that warrant single-cell placement; the policy requires the Warden's written approval in all such circumstances.  The new policy includes requirements for monitoring SHU inmates, including those in single-cell confinement, as well as evaluating and limiting the consecutive amount of time that inmates with serious mental illness may spend in restrictive housing.  The new policy also defines extended placement as occurring when an inmate is continuously housed in a SHU for 6 months or longer.  Additionally, new policy provisions discourage the placement of inmates with serious mental illness in a SHU and require that Psychology Services Department employees conduct initial and 30-day psychological assessments of such inmates.  As a result of the SHU policy revisions, in April 2024 we closed three of the six recommendations from the 2017 report.  The two recommendations related to single-cell confinement from the 2023 capstone report remained open as of March 2024.

See Appendix 2, Items III, XI, and XII, for more information about these reports and Appendix 3 (Special Housing Units) for the policy.

## Employee Misconduct

As of November 27, 2023, there were 98 open misconduct investigations involving FCI Sheridan employees.  Of those cases, 89 were still being investigated.  In the remaining eight cases, the underlying misconduct had been substantiated but the cases were pending a disciplinary sanction decision.  We found that the average time employee misconduct cases have been ongoing exceeds 1.5 years.  In prior work, the OIG has documented how delays in the BOP's staff discipline process have made it difficult to enforce employee standards of conduct.[10]  One reason for the backlog at FCI Sheridan is that the institution had been without a Special Investigative Agent (SIA) to investigate employee misconduct for an extended period (the current

---

[10]  Appendix 2, Item XIII.

SIA started in that position in August 2023). The SIA estimated that it will take a year to investigate all backlogged employee misconduct cases at the institution and stated that reducing the backlog is a priority.

Depending on the severity of employee misconduct allegations and the risk that an employee may pose to the institution, the Warden may elect to remove an employee from regular duty pending the outcome of a misconduct investigation. At the time of our inspection, nine employees had been removed from regular duty while investigations into their alleged misconduct were ongoing.

---

**Relevant Prior OIG Work and Related Recommendations: Employee Misconduct**

In a 2023 report on systemic BOP operational issues, we detailed how the BOP had a backlog of nearly 8,000 employee discipline cases because it had historically lacked a sufficient number of employees to conduct investigations. While we were writing that report, the BOP told us that it was trying to hire additional employees to investigate these cases and was also increasing the authority of the BOP's Central Office-based Office of Internal Affairs (OIA) to supervise investigators located at institutions.

As a result, we recommended that the BOP develop a specific, multiyear plan for how it would evaluate its ongoing and proposed changes to the employee discipline process, as well as key performance indicators, to decrease the backlog of its employee misconduct cases and adjudications. As of the publication of this report on FCI Sheridan, this recommendation remains open.

See Appendix 2, Item XIII, for more information about this report.

---

## Sexual Misconduct

Of the 98 misconduct investigations involving FCI Sheridan employees that were open at the time of our inspection, 20 related to sexual misconduct directed at an inmate.[11] After our inspection, FCI Sheridan and the BOP's Office of Internal Affairs (OIA) reexamined the universe of allegations of sexual misconduct directed at an inmate. Through this effort, the OIA opened additional investigations related to allegations of sexual misconduct that were reported prior to our inspection. As a result, the BOP reported that, as of May 13, 2024, the number of open investigations of FCI Sheridan employee sexual misconduct directed at an inmate increased to 31. We report this data for informational and transparency purposes and note that the volume of sexual misconduct allegations, especially those for which the underlying investigation has yet to be concluded, should not be used, alone, to assess the pervasiveness of sexual misconduct or absence thereof at an institution.

We were unable to determine the total number of allegations of inmate-on-inmate sexual misconduct reported to FCI Sheridan employees. Instead of centrally tracking all allegations, FCI Sheridan centrally tracks only those that institution employees believe merit a full investigation following a preliminary review of evidence. They do not centrally track those allegations believed to lack sufficient evidence to merit a full investigation. While FCI Sheridan could presumably reconstruct existing records to populate the full universe of inmate-on-inmate sexual misconduct allegations, we are concerned that the procedure it was using to track these allegations was inconsistent with Prison Rape Elimination Act (PREA) National Standards, which are incorporated into BOP policy. PREA standards state that correctional agencies "shall collect accurate, uniform data for every allegation

---

[11] For the purposes of this report, we use the term "sexual misconduct" to encompass all forms of sexual misconduct, including harassment and assault.

of sexual misconduct at facilities under its direct control using a standardized instrument and set of definitions."[12] Ultimately, these standards are designed to ensure nationwide that correctional agencies, including the BOP, are able to aggregate sexual misconduct allegations to assess and improve the effectiveness of their sexual misconduct prevention efforts. During a discussion with FCI Sheridan's PREA Coordinator held after the on-site portion of our inspection, we learned that the institution had modified its allegation-tracking method to include all allegations of sexual misconduct.

## Physical Conditions and Infrastructure

At the time of our inspection, we did not identify widespread infrastructure issues that were actively affecting the conditions of confinement for inmates at FCI Sheridan. However, Facilities Department employees told us that many of the institution's systems, including its heating and cooling systems, are approaching the end of their projected lifespan and need to be updated. They estimated the cost of this work to be $21.6 million. FCI Sheridan requested funds from the Western Regional Office to address these issues; however, due to the BOP's limited budgetary resources for infrastructure repair and replacement, the request was unfunded at the time of our inspection.

We are concerned that, if these repairs are not made soon, equipment will fail, which would not only negatively affect the conditions of confinement for inmates but would also cause repair and replacement costs to exceed current estimated levels. This is issue is not unique to FCI Sheridan. The BOP currently estimates that it has a $3 billion backlog of unfunded infrastructure repairs across all of its institutions.

In and around the time of our inspection, Facilities Department employees were also triaging leaks in pipes that brought public utility-provided water into the institution. According to a Facilities employee, when these pipes were installed and buried, a coarse material was placed around the pipes. Over time, that material has compromised the integrity of the pipes, causing the leaks. The effects of pipe leaks are most serious when the leaks occur in close proximity to institution buildings. Just prior to our inspection, an inmate housing area temporarily flooded due to this issue. Given the recent identification of this problem, and the potential scale of work necessary to repair or replace large amounts pipe, at the time of our inspection FCI Sheridan was unable to estimate the cost to address this problem. This cost would be in addition to the $21.6 million previously requested. See the image on the right showing the aftermath of a leak and repair efforts.



Aftermath of Pipe Leak and Repair Efforts
Source: OIG, November 2023

---

[12] See 28 C.F.R. § 115.87 and Appendix 3 (Sexually Abusive Behavior Prevention and Intervention Program).

We also found a number of unaddressed minor repair issues at FCI Sheridan. These issues included the deterioration of building siding at the MSP, which in turned caused leaks in the gymnasium. See images of these issues below.



*Left*, Deteriorating Building Siding, *Right*, Temporary Leak Remediation in the MSP Gymnasium Building
Source: OIG, November 2023

Further, to prevent inmates from hiding contraband behind recessed, ground-level lighting, Facilities Department employees removed lights, which exposed a recessed wall box housing electrical connections and wires. We also found that plates that cover other electrical components had been removed for similar reasons. According to FCI Sheridan leadership, these exposed endpoints and wires were no longer receiving electricity; but we did not test the endpoints or wires to confirm this. See the images below for examples of exposed, recessed wall boxes that house electrical connections and wires.



*Left and Right*, Former Ground-level Lighting with Exposed Wall Boxes That House Electrical Connections and Wires
Source: OIG, November 2023

At the Camp, we observed poor physical conditions including broken toilets and sinks. We also found some areas, including the bathrooms, to be unclean and found a dark substance on a shower floor. We note that inmate orderlies are responsible for ensuring that inmate areas are kept clean, but it is also incumbent on institution employees to hold inmates accountable for cleaning inmate areas.



*Left,* Broken Sink at the Camp, *Right,* Dark Substance on a Shower Floor at the Camp

Source: OIG, November 2023

### Relevant Prior OIG Work and Related Recommendations: Infrastructure

In May 2023, the OIG reported that BOP institutions had a large and growing list of unfunded modernization and repair needs and that the BOP was unable to address these needs because it lacked a strategy to do so. Further, we found that the BOP had historically failed to request funding to address its infrastructure needs.

To address this issue, the OIG recommended that the BOP develop an infrastructure strategy to increase the overall effectiveness of facilities management and to develop and implement key performance indicators to track whether the BOP is meeting its infrastructure goals. As of the publication of this report on FCI Sheridan, these recommendations remain open.

See Appendix 2, Item XIV, for more information about this report.

## Food Service

We found FCI Sheridan's food service and storage warehouses to be clean and functioning well. At the time of our inspection, FCI Sheridan employees told us that some institution equipment was inoperable, but, while inconvenient, did not prevent the institution from preparing and serving meals. Following our on-site inspection, FCI Sheridan management told us that repairs to food service equipment to support effective food service operations were ongoing. We note that one particular strength of FCI Sheridan's food service operations was its bakery, where inmate workers prepare fresh breads and cakes for meals. The images below show the preparation and service of fresh bread at FCI Sheridan.



*Left,* Bread Preparation at FCI Sheridan, *Right,* Baked Bread
Source: OIG, November 2023

## Inmate Court Visits

The U.S. Marshals Service (USMS) is responsible for transporting to court those FCI Sheridan inmates who have court appearances. Most of these inmates are housed at the FDC and are awaiting trial, actively being tried, or awaiting sentencing. According to a USMS official from the District of Oregon who is responsible for prisoner transportation, the USMS had historically housed inmates who were not routinely appearing in court (e.g., inmates who were detained before their trials began or who were awaiting sentencing following a conviction) at the FDC at FCI Sheridan. This USMS official further explained that the USMS housed inmates routinely attending court (e.g., inmates whose criminal trials were in progress) in facilities other than FCI Sheridan, i.e., detention centers operated by local governments that are in closer proximity, than is FCI Sheridan, to federal district courts in Oregon. Given this arrangement, the USMS had to transfer inmates to and from the FDC only on a monthly basis. Due to operational changes, in 2023 the USMS decreased its use of local government-operated detention centers and in turn increased its use of the FDC at FCI Sheridan as a place to house inmates who were routinely attending court. To transport these inmates to court, the USMS and FCI Sheridan officials agreed to a twice-weekly inmate transport schedule whereby FCI Sheridan employees would both discharge inmates to the custody of the USMS for transport to court and receive inmates from the custody of the USMS following the inmates' court appearances.

The U.S. Marshal for the District of Oregon told us that, under this recently updated arrangement, the USMS had to find housing in locations other than the FDC at FCI Sheridan for inmates in advance of their court appearances under two circumstances: (1) if their appearances were not scheduled for the same day on which they were retrieved from the FDC, and (2) if a return trip to the FDC was not scheduled on the same day as their court appearances. We found that this dynamic had some effects on the operations of health services for FCI Sheridan and its inmates. Specifically, because inmates who attended court could be away from the FDC for multiple days, FCI Sheridan Health Services Department employees had to provide inmates

23

who required daily medication with enough medication to cover the number of days they would be away from the institution. Further, FCI Sheridan employees had to re-screen inmates who left the FDC for more than 24 hours for potential health issues before those inmates could be readmitted. We found that this increased burdens on already short-staffed Health Services Department employees. This arrangement also presented potential risks for inmates with chronic health issues because the continuity of their care could have been interrupted when they were temporarily transferred to a different detention facility staffed by clinicians who may have been unfamiliar with their conditions and healthcare needs.

After the BOP received a draft of this report, we learned that the twice-weekly inmate transport schedule has increased to 4 times per week. According to an official for the USMS District of Oregon, the USMS is hopeful that the increased transport schedule will allow for FCI Sheridan FDC inmates to be picked up and returned to the FDC on the same day as their court appearances, thereby decreasing the burden and risks associated with housing inmates away from the FDC for multiple days.

# Conclusion

Our unannounced inspection identified several serious safety and security issues at FCI Sheridan affecting both employees and inmates. Most significantly, substantial shortages of Correctional Officers and healthcare workers have created widespread and troubling operational challenges that substantially affect the health, welfare, and safety of employees and inmates.

For example, healthcare staffing challenges seriously affect FCI Sheridan's ability to provide adequate healthcare to inmates. One area affected by staffing challenges is the performance of routine, daily functions, such as drawing blood for laboratory tests, triaging patient requests for care, and ensuring that medical equipment and supplies are ready to be used for routine care and in the event of a medical emergency. Particularly alarming was our finding that the institution had a backlog of 725 laboratory blood test or urine collection orders and 274 pending x-ray orders. These backlogs cause medical conditions to go undiagnosed and leave providers unable to appropriately treat patients. Specifically, an FCI Sheridan physician told us that the backlog of laboratory orders for blood draws or urine collection has compromised his ability to treat patients and has prevented him from monitoring the effects of medication on his patients' kidney and liver functions. We note that, after receiving a draft of the report, and after the OIG expressed concerns about the issue to the BOP, FCI Sheridan took action to decrease these backlogs; specifically, as of May 2024 the backlog of laboratory orders stood at 44 and the number of pending x-ray orders stood at 84. These limitations are concerning for the treatment of any medical condition, but especially concerning for the treatment of chronic conditions, such as diabetes and hepatitis C, that regularly affect inmates. We also found that, just prior to our inspection, an inmate feigned a suicide attempt in order to receive medical attention for an untreated ingrown hair that had become infected. When finally examined after the feigned suicide attempt, he required hospitalization for 5 days to treat the infection. Additionally, while not directly related to staff shortages, we observed a variety of potentially dangerous medication distribution practices.

We also found that FCI Sheridan did not always have available Correctional Officers to escort inmates to external medical providers. At the time of our inspection, 101 outside appointments had been canceled between January and November 2023 due to the lack of available employees to escort inmates to these appointments. Additionally, due to a critical shortage of dental supply items, dental care at FCI Sheridan was limited to intake examinations, clinical examinations, and walk-in clinic triage. As a result of these modified operations, in October 2023 approximately 350 inmates were on a waitlist for routine dental care and 41 percent of them had been on the waitlist for 2 years or more.

Further, we found that Psychology Services Department and Education Department staff shortages resulted in significant wait times for psychological, educational, and vocational programs. We also were disturbed to find that serious shortages among FCI Sheridan employees who facilitate the BOP's Residential Drug Abuse Programs (RDAP)—only 5 of 16 positions for drug treatment program employees were filled at the time of our visit—has resulted in the institution being unable to offer the program to many eligible inmates who had been transferred from other institutions specifically to participate in FCI Sheridan's program. As a cumulative result of these issues, we found that FCI Sheridan offered inmates limited opportunities to prepare for successful reentry into our communities. Three days after our inspection concluded, BOP Director Colette Peters suspended the RDAP at the Camp.

In addition, FCI Sheridan's Correctional Officer vacancy rate has meant that institution management is not always able to fill all inmate-monitoring posts and therefore lacks the employees it needs to safely supervise

25

inmates. As a result, inmates must routinely be confined to their cells during daytime hours and are therefore often unable to participate in programs and recreational activities. As we have detailed in our prior work, when inmates are not appropriately monitored the chance that they will engage in self-harm, violence, and other illicit activities increases.

In an effort to staff correctional posts, institution leadership requires all Correctional Officers to perform mandatory overtime. FCI Sheridan Correctional Officers told us that high levels of overtime can negatively affect morale and their attentiveness when supervising inmates. Institution management also requires non-correctional employees, many of whom facilitate or teach inmate programming, to serve in correctional posts rather than attend to their regular duties. However, doing so may cause them to cancel classes, further limiting inmate access to programming.

During our inspection, we also found that FCI Sheridan did not centrally track the number of all allegations of inmate-on-inmate sexual misconduct reported to employees. As a result, we were unable to determine the total number of allegations of inmate-on-inmate sexual misconduct reported to FCI Sheridan employees. Ultimately, the failure to accurately track these allegations undermines the ability of both FCI Sheridan and the BOP to collect data consistent with Prison Rape Elimination Act standards that would allow them to assess and improve the effectiveness of sexual misconduct prevention efforts.

Whereas our prior inspections of BOP institutions found significant concerns relating to infrastructure, security cameras, and food service, we identified comparatively fewer concerns in these areas at FCI Sheridan. For example, we did not identify widespread infrastructure issues that were actively affecting the conditions of confinement for inmates. Nonetheless, we did identify water pipe failures that caused occasional flooding in inmate areas, deteriorated building siding that caused water intrusion into inmate areas, and exposed electrical wires throughout the institution. We also were told that many of the institution's systems are approaching the end of their projected lifespan and need to be updated. Officials estimated the cost of this work to be $21.6 million.

Ultimately, many of the significant issues we identified at FCI Sheridan were consistent with BOP-wide issues on which we have made recommendations in prior work. Because those prior recommendations direct the BOP to address these issues of concern at an enterprise level, we do not make new recommendations in this report that would be duplicative of them but instead repeat our prior ones and highlight throughout this report how the prior recommendations relate to FCI Sheridan. Through our efforts to resolve the prior recommendations, we will monitor the BOP's efforts to address the identified issues at all of its institutions, including FCI Sheridan.

26

# Appendix 1: Purpose, Scope, and Methodology

## Standards

The DOJ OIG conducted this inspection in accordance with the Council of the Inspectors General on Integrity and Efficiency's Quality Standards for Inspection and Evaluation (December 2020).

## Purpose and Scope

The OIG has determined that it can enhance the effectiveness of its oversight, as well as its ability to alert the BOP of concerns, by conducting short-notice and unannounced inspections of BOP facilities, as appropriate. Pursuant to the OIG's planned procedures for initiating an inspection, which we had previously shared with the BOP, the OIG notified FCI Sheridan at approximately 8 a.m. on November 27, 2023, that it would be initiating an inspection beginning at noon that day. The OIG team, which consisted of 10 OIG employees and 2 medical subject matter experts contracted by the OIG, conducted the on-site inspection Monday, November 27, through Friday, December 1, 2023. The focus of our inspection was the state of institution operations at the time of our inspection; although, for certain portions of our analysis, our scope included roughly the year that preceded our inspection, beginning in November 2022.

We selected FCI Sheridan as the site of our third inspection because we wanted to better understand and assess the conditions of confinement for male inmates. We also note that the OIG's BOP Interdisciplinary Team (which facilitates inter-OIG collaboration on BOP oversight issues) contributed to the inspection team's site selection. Specifically, the Interdisciplinary Team created a forum for DOJ OIG Special Agents, who investigate criminal and administrative misconduct at BOP institutions, to communicate their general concerns regarding FCI Sheridan's operations to the inspection team.

The scope of this inspection did not include specialized testing to definitively determine, for example, the potential presence of mold and other hazardous substances. In addition, although this report includes information on allegations of sexual abuse, we report this data for informational and transparency purposes and note that the volume of sexual abuse investigations (especially those for which the underlying investigation has yet to be concluded) should not be used, alone, to assess the pervasiveness of sexual abuse or absence thereof at an institution.

## Inspection Methodology

To better understand FCI Sheridan's operations, we toured the institution, interviewed its inmates and employees, and reviewed its operational records.

## Observations

We toured the interior and exterior of the medium-security facility and its adjacent detention center and camp, including general population inmate housing units; the Special Housing Units (SHU); Health Services Department spaces; front lobby employee entrances and screening areas; programming areas used by the Psychology, Education, and Recreation Departments; the mail room; the commissary; laundry areas; the evidence storage area; the visitation room; inmate intake and screening areas; Facilities Department areas; food storage warehouses; and food preparation and dining areas.

We also reviewed security camera footage, as well as the functionality of the security camera system. Further, we tested ambient temperatures throughout the institution, as well as the functionality of showers, sinks, and toilets in inmate housing areas.

## Interviews

We conducted on-site interviews with FCI Sheridan inmates who were housed in both the general population and the SHU, as well as on-site interviews with institution employees. Employees we interviewed included the Warden; Associate Wardens, one of whom serves as the institution's Prison Rape Elimination Act Coordinator; supervisory and nonsupervisory Correctional Officers; healthcare providers; case managers; teachers; food service workers; and employees responsible for institution safety, facilities management, and the trust fund program. Following our on-site work at FCI Sheridan, we conducted virtual follow-up interviews with select FCI Sheridan employees, select employees at the BOP's Western Regional Office, and select employees at the BOP's Central Office. We also interviewed select employees at the U.S. Marshals Service.

## Document Review and Analysis

We reviewed FCI Sheridan records related to facilities management, staffing levels, use of overtime and augmentation, use of restrictive housing, provision of inmate healthcare, food service, inmate discipline, employee misconduct, sexual abuse reporting and tracking, inmate programming, and FIRST STEP Act implementation.

## External Subject Matter Experts Assisting the OIG

To assist the OIG in its efforts to assess the provision of healthcare to FCI Sheridan inmates, the OIG contracted the services of two healthcare subject matter experts: one physician and one registered nurse.

# Appendix 2: DOJ OIG Related Work

I.  For the FCI Waseca **inspection report**, see DOJ OIG, *Inspection of the Federal Bureau of Prisons' Federal Correctional Institution Waseca*, Evaluation and Inspections (E&I) Report 23-068 (May 2023), oig.justice.gov/reports/inspection-federal-bureau-prisons-federal-correctional-institution-waseca.

II. For the FCI Tallahassee **inspection report**, see DOJ OIG, *Inspection of the Federal Bureau of Prisons' Federal Correctional Institution Tallahassee*, E&I Report 24-005 (November 2023), oig.justice.gov/reports/inspection-federal-bureau-prisons-federal-correctional-institution-tallahassee.

III. For prior OIG reporting on BOP inmate **deaths in custody**, see DOJ OIG, *Evaluation of Issues Surrounding Inmate Deaths in Federal Bureau of Prisons Institutions*, E&I Report 24-041 (February 2024), oig.justice.gov/reports/evaluation-issues-surrounding-inmate-deaths-federal-bureau-prisons-institutions.

IV. For prior OIG reporting on the BOP's use of **overtime**, see DOJ OIG, *Management Advisory: Analysis of the Federal Bureau of Prisons' Fiscal Year 2019 Overtime Hours and Costs*, Audit Report 21-011 (December 2020), oig.justice.gov/reports/management-advisory-analysis-federal-bureau-prisons-fiscal-year-2019-overtime-hours-and.

V.  For additional prior OIG reporting on the BOP's **staffing challenges**, see DOJ OIG, *Investigation and Review of the Federal Bureau of Prisons' Custody, Care, and Supervision of Jeffrey Epstein at the Metropolitan Correctional Center in New York, New York*, Investigations Report 23-085 (June 2023), oig.justice.gov/reports/investigation-and-review-federal-bureau-prisons-custody-care-and-supervision-jeffrey.

VI. For prior OIG reporting on the insufficiency of the BOP's **security camera systems** and **contraband introduction** at BOP institutions, see DOJ OIG, *Review of the Federal Bureau of Prisons' Contraband Interdiction Efforts*, E&I Report 16-05 (June 2016), oig.justice.gov/reports/review-federal-bureau-prisons-contraband-interdiction-efforts.

VII. For additional prior OIG reporting on the insufficiency of the BOP's **security camera systems**, see DOJ OIG, *Management Advisory Memorandum: Notification of Needed Upgrades to the Federal Bureau of Prisons' Security Camera System*, E&I Report 22-001 (October 2021), oig.justice.gov/reports/management-advisory-memorandum-notification-needed-upgrades-federal-bureau-prisons-security.

VIII. For prior OIG reporting on the BOP's **medical staffing challenges**, see DOJ OIG, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges*, E&I Report 16-02 (March 2016), oig.justice.gov/reports/review-federal-bureau-prisons-medical-staffing-challenges.

IX. For additional prior OIG reporting on the BOP's **medical staffing challenges**, see Pandemic Response Accountability Committee, *Federal Telehealth Report, Insights on Utilization and Program Integrity Risks Across Selected Health Care Programs in Six Federal Agencies* (September 2023), www.pandemicoversight.gov/oversight/our-publications-reports.

29

X.    For prior OIG work on the BOP's scheduling of **outside medical visits**, see DOJ OIG, _Audit of the Federal Bureau of Prisons Comprehensive Medical Services Contracts Awarded to the University of Massachusetts Medical School_, Audit Report 22-052 (March 2022), oig.justice.gov/reports/audit-federal-bureau-prisons-comprehensive-medical-services-contracts-awarded-university.

XI.    For prior OIG reporting on the use of **restrictive housing** for inmates with mental illness and **single-celling**, see DOJ OIG, _Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness_, E&I Report 17-05 (July 2017), oig.justice.gov/reports/review-federal-bureau-prisons-use-restrictive-housing-inmates-mental-illness.

XII.    For prior OIG reporting on **single-celling**, see DOJ OIG, _Capstone Review of the Federal Bureau of Prisons' Response to the COVID-19 Pandemic_, E&I Report 23-054 (March 2023), oig.justice.gov/reports/capstone-review-federal-bureau-prisons-response-coronavirus-disease-2019-pandemic.

XIII.    For prior OIG reporting on the BOP's **investigative backlog of employee misconduct cases**, see DOJ OIG, _Limited-Scope Review of the Federal Bureau of Prisons' Strategies to Identify, Communicate, and Remedy Operational Issues_, E&I Report 23-065 (May 2023), oig.justice.gov/reports/limited-scope-review-federal-bureau-prisons-strategies-identify-communicate-and-remedy.

XIV.    For prior OIG reporting on the BOP's **infrastructure management challenges**, see DOJ OIG, _The Federal Bureau of Prisons' Efforts to Maintain and Construct Institutions_, Audit Report 23-064 (May 2023), oig.justice.gov/reports/federal-bureau-prisons-efforts-maintain-and-construct-institutions.

30

# Appendix 3: BOP Policies Cited

| Topic Discussed in Report | Relevant Program Statement | Link |
|---|---|---|
| Patient Care | 6031.04<br>**Patient Care**<br>June 3, 2014 | www.bop.gov/policy/progstat/6031_004.pdf<br><br>(accessed February 26, 2024) |
| Dental Services | 6400.03<br>**Dental Services**<br>June 10, 2016 | www.bop.gov/policy/progstat/6400_003.pdf<br><br>(accessed February 26, 2024) |
| Pharmacy Services | 6360.01<br>**Pharmacy Services**<br>January 15, 2005 | www.bop.gov/policy/progstat/6360_001.pdf<br><br>(accessed February 26, 2024) |
| Residential Drug Abuse Program | 5330.11<br>**Psychology Treatment Programs**<br>March 16, 2009 | www.bop.gov/policy/progstat/5330_011.pdf<br><br>(accessed February 26, 2024) |
| Special Housing Units | 5270.12<br>**Special Housing Units**<br>March 5, 2024 | www.bop.gov/policy/progstat/5270.12.pdf<br><br>(accessed March 7, 2024) |
| Sexual Abuse | 5324.12<br>**Sexually Abusive Behavior Prevention and Intervention Program**<br>June 4, 2015 | www.bop.gov/policy/progstat/5324_012.pdf<br><br>(accessed February 26, 2024) |

31

# Appendix 5:  OIG Analysis of the BOP's Response

In its formal response, the BOP acknowledged the serious issues identified in this report and reiterated its commitment to addressing open recommendations from previous OIG reports.  The BOP also stated that it appreciated that the OIG did not make recommendations in this report.  As mentioned multiple times in this report, we did not make separate recommendations specific to FCI Sheridan because the significant concerns we uncovered at this institution were consistent with systemic issues that the OIG has identified in its prior work, which resulted in the OIG making numerous recommendations directing the BOP to address these issues at an enterprise-wide level.  The lack of recommendations in this report is not an indication that our findings at FCI Sheridan are not serious, or that they do not require immediate action from the BOP.

While we are encouraged by the steps the BOP has taken to address healthcare backlogs and other issues identified in our report, the OIG notes that the progress cited in the BOP's formal response occurred after the OIG inspection identified these issues of significant concern.  It is critical that the BOP address the OIG's open recommendations related to staffing, infrastructure, and other foundational challenges so that the concerns identified in this inspection are addressed by the BOP in a proactive manner across the entirety of the BOP.

We will closely monitor the BOP's efforts to remedy the issues identified at FCI Sheridan as part of our oversight of the BOP's corrective actions to address the systemic issues identified in our prior work.

34

# Appendix 5: OIG Analysis of the BOP's Response

In its formal response, the BOP acknowledged the serious issues identified in this report and reiterated its commitment to addressing open recommendations from previous OIG reports. The BOP also stated that it appreciated that the OIG did not make recommendations in this report. As mentioned multiple times in this report, we did not make separate recommendations specific to FCI Sheridan because the significant concerns we uncovered at this institution were consistent with systemic issues that the OIG has identified in its prior work, which resulted in the OIG making numerous recommendations directing the BOP to address these issues at an enterprise-wide level. The lack of recommendations in this report is not an indication that our findings at FCI Sheridan are not serious, or that they do not require immediate action from the BOP.

While we are encouraged by the steps the BOP has taken to address healthcare backlogs and other issues identified in our report, the OIG notes that the progress cited in the BOP's formal response occurred after the OIG inspection identified these issues of significant concern. It is critical that the BOP address the OIG's open recommendations related to staffing, infrastructure, and other foundational challenges so that the concerns identified in this inspection are addressed by the BOP in a proactive manner across the entirety of the BOP.

We will closely monitor the BOP's efforts to remedy the issues identified at FCI Sheridan as part of our oversight of the BOP's corrective actions to address the systemic issues identified in our prior work.

34

'RLY NEWS
NPR 24 Hour Program Stream
On Air Now
L  EN LIVE
MY PLAYLIST



DONATE

CONSIDER THIS FROM NPR
CONSIDER →THIS

LISTEN & FOLLOW ⌄

# Why Are So Many Inmates at This Federal Prison Dying?

SEPTEMBER 22, 2023 · 4:54 PM ET

**16-Minute Listen**
PLAYLIST     TRANSCRIPT



Margarita Ramirez stands in front of an altar in her home that honors her son Jeffrey, who died earlier this year. He was diagnosed with cancer while in prison and died at age 41.

*Ariana Drehsler for NPR*

Close to five thousand people have died in federal prison since 2009.

There are 100 federal prisons across the U.S. An NPR investigation found that a quarter of those deaths happened at one federal prison.

Butner Federal Correctional Complex in North Carolina.

Inmates have a constitutional right to health care. Being denied care is considered cruel and unusual punishment.

But many of the sick inmates who wind up at Butner don't get the healthcare they are entitled to – and some end up dying.

NPR's Meg Anderson tried to find out why.

Email us at considerthis@npr.org.

*This episode was produced by Graham Smith and Brianna Scott with engineering by Stacey Abbott. Barbara Van Woerkom and Tirzah Christopher contributed research, and Nick McMillan provided data analysis. It was edited by Robert Little. Our executive producer is Sami Yenigun.*



 **n p r**                                                      DONATE

**CONSIDER THIS FROM NPR**   | LISTEN & FOLLOW   ⌄ |

CONSIDER
→THIS

# Why Are So Many Inmates at This Federal Prison Dying?

SEPTEMBER 22, 2023 · 4:54 PM ET

**16-Minute Listen**                          PLAYLIST     TRANSCRIPT



Margarita Ramirez stands in front of an altar in her home that honors her son Jeffrey, who died earlier this year. He was diagnosed with cancer while in prison and died at age 41.

*Ariana Drehsler for NPR*

Close to five thousand people have died in federal prison since 2009.

There are 100 federal prisons across the U.S. An NPR investigation found that a quarter of those deaths happened at one federal prison.

Butner Federal Correctional Complex in North Carolina.

Inmates have a constitutional right to health care. Being denied care is considered cruel and unusual punishment.

But many of the sick inmates who wind up at Butner don't get the healthcare they are entitled to – and some end up dying.

NPR's Meg Anderson tried to find out why.

Email us at considerthis@npr.org.

*This episode was produced by Graham Smith and Brianna Scott with engineering by Stacey Abbott. Barbara Van Woerkom and Tirzah Christopher contributed research, and Nick McMillan provided data analysis. It was edited by Robert Little. Our executive producer is Sami Yenigun.*



NPR 24 Hour Program Stream
On Air Now

MY PLAYLIST



DONATE

NATIONAL

# Why 1 in 4 inmate deaths happens in the same federal prison in North Carolina

SEPTEMBER 25, 2023 · 5:08 AM ET

HEARD ON MORNING EDITION

By Michel Martin, Meg Anderson

**3-Minute Listen**                    PLAYLIST    TRANSCRIPT

A quarter of federal inmate deaths occur at North Carolina's Butner prison complex. Some federal inmates only arrived at its medical facility after waiting months or even years for care elsewhere.

Sponsor Message

MICHEL MARTIN, HOST:

A new NPR investigation has revealed a disturbing pattern.

STEVE INSKEEP, HOST:

Yeah. Of the 5,000 people who died in the past decade while in federal custody, 1 out of 4 died in the same prison.

MARTIN: NPR's Meg Anderson is with us now to explain what's behind those numbers. Meg, good morning.

MEG ANDERSON, BYLINE: Good morning.

MARTIN: So let me just clarify one thing. There are more than 120 federal prisons, and we are talking about just one. So tell us what's going on there.

ANDERSON: Yeah. So it is a prison in North Carolina. It's called the Butner Federal Medical Center. And to an extent, more death there makes total sense. It's a prison hospital, and it's the Bureau of Prisons' main cancer treatment facility. Cancer is one of the BOP's leading causes of death. So that explains a lot of it. But it doesn't explain all of it. When we started looking into the experiences of individual people, people who got really sick in prison, people who died in prison, we found stories of inmates all over the country going without needed medical care. And sometimes when they finally did end up at Butner for advanced care, it was too late to do much for them.

MARTIN: Tell us about some of the stories you found.

ANDERSON: Yeah. We found more than a dozen inmates who waited months, and some of them even years, for medical care. One inmate who ended up at Butner that we ended up focusing on, his name was Jeffrey Ramirez, and he found a lump in his testicle. He asked to see a doctor, but he didn't get an ultrasound until more than a year after he started complaining. He was eventually diagnosed with the final stage of testicular cancer. And when I interviewed him this year, he had been released from prison early, essentially to die at home. And he felt sure that it would have been different if he had been on the outside.

JEFFREY RAMIREZ: I know myself. That's the first place I would go. I'd go to the doctor. This would not happen. And I'm angry. I'm angry because it didn't have to get this far.

ANDERSON: Yeah. And he died just 11 days after he talked with me.

MARTIN: OK. But, Meg, Butner is a prison hospital. So are these men, women – I guess both – are they getting better care once they get there?

ANDERSON: Yeah. Just men, actually. And not necessarily. We found problems there, too. One man in prison there, Frank Carr, he waited more than a year for heart surgery. When I talked to him over the phone, he sounded panicky.

FRANK CARR: I do not want to die because I see so many people die in here. I witnessed people die, and I don't want to be one of the statistics.

ANDERSON: And he did end up getting his surgery. But another man we found waited five months for surgery to treat skin cancer. By then, it wasn't feasible anymore. Another inmate died after staff failed to give him his anti–epileptic medication. And last fall, two Butner inmates died in the night after they didn't get timely medical attention. And I should note that the BOP declined our request for an interview, but they said they are, quote, "committed to providing safe and effective health care."

MARTIN: Were you able to talk with anyone at the prison?

ANDERSON: So current and former staff at Butner told me that they think understaffing is the main reason for these delays in care. Of course, one way to fix that would be to hire more people. Another way would be to lower the prison population. But part of the problem is we just don't actually have that much insight into what happens inside prisons. That's according to Michele Deitch. She directs the Prison and Jail Innovation Lab at the University of Texas at Austin.

MICHELE DEITCH: There are so many things that we don't know about our prisons. How dangerous are they? How much violence is there? How well does the health care system work? – things that you would just assume we would know.

ANDERSON: So until there's independent oversight, it's hard for anyone to recommend concrete steps.

MARTIN: OK. That is NPR's Meg Anderson. Meg, thank you so much for this reporting.

ANDERSON: Thank you.

(SOUNDBITE OF KAFABINDUNYA'S "BINLERCE OZUR")

Copyright © 2023 NPR. All rights reserved. Visit our website terms of use and permissions pages at www.npr.org for further information.

NPR transcripts are created on a rush deadline by an NPR contractor. This text may not be in its final form and may be updated or revised in the future. Accuracy and availability may vary. The authoritative record of NPR's programming is the audio record.



# The news you need to start your day

Our journalists summarize the biggest stories in the Up First newsletter so you can stay informed, not overwhelmed.

| Email address | SUBSCRIBE |

See more subscription options

By subscribing, you acknowledge and agree to NPR's Terms of Use and Privacy Policy. NPR may share your name and email address with your NPR station. See Details.

**e Stories From NPR**